## MARTIN et al. v. FEDERAL SECURITY AGENCY, SOCIAL SECURITY BOARD.

### Civil Action No. 79.

District Court, W. D. Pennsylvania.

Aug. 8, 1947.

William B. Washabaugh, Jr., of Erie, Pa., for plaintiffs.

Charles F. Uhl, U. S. Atty., of Pittsburgh, Pa., for defendant.

FOLLMER, District Judge.

This action is brought to review a final decision of the Social Security Board that the deceased wage earner, Carl P. Martin, was neither fully nor currently insured at the time of his death, that accordingly the claimant, Hannah Martin, is not entitled to widow's current insurance benefits under Section 202 (e) of the Social Security Act, 42 U.S.C.A. § 402 (e), and Social Security Regulations No. 3 (20 C.F.R. Cum.Supp. 403), Sections 403.201 (a),

403.202 (a) and 403.406 (a) (1), nor to child's insurance benefits on behalf of Joseph H. Martin and Patricia L. Martin under Section 202 (c) of the Social Security Act, 42 U.S.C.A. § 402 (c), and Social Security Board Regulations No. 3, Sections 403.201 (a), 403.202 (a), and 403.404 (a) (1) (ii).

Section 205 (g) of the Act provides for judicial review of the record made before the Board, and grants the District Court power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Board, with or without remanding the cause for a rehearing," subject to the condition that "findings of the Board as to any fact, if supported by substantial evidence, shall be conclusive, * * *." 42 U.S.C.A. § 405 (g).

Both plaintiffs and defendant have presented motions for summary judgment under Federal Rules of Civil Procedure, rule 56, 28 U.S.C.A. following section 723c, each claiming to be entitled to prevail as a matter of law.

The facts are undisputed. The deceased wage earner had been employed as a "shipper" by Western Stevedoring Company, Erie, Pennsylvania, hereinafter referred to as "Western," for a total of thirty quarters from 1937 through 1944, amply sufficient for recovery under the Social Security Act provided jurisdiction over this entire period as to such employment was in the Social Security Board and not in the Railroad Retirement Board.[1]

Western is a Delaware corporation organized for the purpose of performing stevedoring services. It had entered into several contracts with Pennsylvania Railroad Company, hereinafter referred to as "Pennsylvania" (clearly a "carrier" subject to part 1 of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq.), to render loading and unloading services.[2]

---

[1] Decision of Social Security Board, August 11, 1945, Cases Nos. 3—413, 3—414, 3—415, Hannah Martin, et al., states:

" * * * It appears that the Bureau of Old-Age and Survivors Insurance has found that all factors of entitlement have been met with the exception that the wage earner was neither fully nor currently insured at the time of his death. In order to have attained a fully insured status the wage earner must have acquired fifteen quarters of coverage after 1936. The terms 'quarter' and 'calendar quarter' mean a period of three calendar months ending on March 31, June 30, September 30, or December 31. A 'quarter of coverage' means a calendar quarter in which the individual has been paid not less than $50 in 'wages' (section 209(g) [42 U.S.C.A. § 409(g)]). In order to have attained a currently insured status the wage earner must have received not less than $50 in 'wages' for each of not less than six of the twelve quarters immediately preceding the quarter in which he died (section 209(h) ). * * *"

"According to the record the wage earner was paid the following remuneration by the contractor, for service as a 'shipper,' in the quarters indicated:

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|------|-----------|-----------|-----------|-----------|
| 1937 | —— | 572.17 | —— | 651.25 |
| 1938 | 315.62 | 205.61 | 314.99 | 385.61 |
| 1939 | 292.50 | 339.37 | 438.44 | 363.43 |
| 1940 | 324.37 | 368.44 | 55.00 | 355.00 |
| 1941 | 344.06 | 421.00 | 329.40 | 402.28 |
| 1942 | 408.60 | 415.64 | 332.80 | 306.60 |
| 1943 | 492.00 | 748.00 | 432.00 | 745.00 |
| 1944 | 606.00 | 543.20 | 591.20 | 698.70" |

(Note. The above tabulation indicates that the amount of wages earned by deceased wage earner prior to January 2, 1940, totalled $3,878.99, those earned thereafter totalled $8,919.29, or a total earning beginning with the year 1937 until the time of his death of $12,-798.28.)

[2] This generalization of the Social Security Board (Decision Page 3) of the work contemplated by the contracts, while expressing in a general way the over-all operation, does not give a complete picture of the highly specialized operations in the loading and unloading process. It fails to mention the work house operations, including that of processing the grain, i.e., cleaning, clipping, desmutting, washing and drying, and shelling corn; the bagging house,

The first question posed before the Social Security Board was whether Western because of its contractual relationship with Pennsylvania, was during the period covered in the suit directly or indirectly owned or controlled by Pennsylvania, and, if so, whether Western operated any equipment or facility, or performed any service in connection with the transportation of property by railroad. The Board found that the record would not justify a finding that Western was owned by Pennsylvania but did find that clearly Western did operate equipment and facilities and performed services for Pennsylvania in connection with the transportation of property by railroad and the receipt, elevation, transfer in transit, and storage of property transported by railroad, and thus limited the issue to whether Western was directly or indirectly controlled by Pennsylvania. I am in agreement with the conclusion of the Board that the sole issue here is that of control.

Western operated grain elevators for Pennsylvania at Girard Point in the City of Philadelphia, Pennsylvania; Canton in the City of Baltimore, Maryland; Greenville in the City of Jersey City, New Jersey, and at Erie, Pennsylvania. In a general way the operation was as follows: The grain was brought to the elevator by railroad cars or arrived by water on vessels. When brought in by rail the cars were placed by Pennsylvania at the elevator. Pennsylvania furnished to the operator, Western, information with respect to the grade and kind of grain as well as the consignee or owner and the services to be performed in the handling and storage by Western. Having furnished

this information, the services of Pennsylvania with respect to the grain ceased until or unless the grain was loaded outbound into cars for movement by rail. In short, the services performed by Western with respect to the grain were those generally performed by a stevedoring company.[3]

With the exception of a few small tools, all of the equipment, including pier facilities and ships' gear, used by Western was the property of Pennsylvania, a universal practice on the entire eastern seaboard; actually, it has been the long established practice in stevedoring work for the ship or its owners, or the railroad company, to furnish loading and unloading facilities.[4] Western was separately owned and staffed. None of its stock was at any time covered by this suit, owned by Pennsylvania or any of its officers, and none of the principal officers of Western were, during such period, also officers of Pennsylvania or any other common carrier.

Records pertaining to receipts, shipments, and handlings of grain were made and kept by employees of Western. All of the work performed by Western was done solely by its employees. They were hired by and could only be discharged by Western. The manner of the rendition of their services was wholly under the supervision and direction of Western. They were paid wholly by Western and solely out of its funds.[5] To all intents and purposes they were employees of Western and of no one else.

Stevedoring services were performed by Western for Pennsylvania at the various points hereinafter referred to under sep-

---

wherein are housed machines for sewing, conveying and bagging grain; nor the fact that the elevator, buildings, appurtenances and appliances are kept in running repair by employees of Western, a repair force that is a highly trained and flexible organization, capable of performing millwright work, carpentry, sheet metal work, and electrical repairs.

See statement Western Stevedoring Company, Social Security Board Hearing Exhibit AC–5, Pages 4 to 8 inc., Operations of Elevator at Girard Point, Philadelphia, Pennsylvania, Page 13 of the statement reads:

"The description of services given

with respect to the operation of elevator at Girard Point, Philadelphia, Pennsylvania, applies also to the services available at the Erie elevator. Although the facilities may be slightly different in design or manufacture, the principle of operation is identical in every respect."

[3] Statement Western Stevedoring Company, Social Security Board Hearing, Exhibit AC–5, Pages 2 and 3.

[4] Statement Western Stevedoring Company, Social Security Board Hearing, Exhibit AC–5, page 17.

[5] Statement Western Stevedoring Company, Social Security Board Hearing, Exhibit AC–5, Pages 13 and 14.

arate contracts for each location[6] All of the contracts referred to were offered in evidence excepting that covering the operations at Erie under date of December 1, 1926.

The original contracts were all similar to the one covering the operation at Canton in the City of Baltimore, Maryland, and dated May 14, 1927. This contract provided, inter alia, that Western agreed that it would operate such elevator, appurtenances and appliances in a prompt and workmanlike manner under the supervision and control of the General Agent and Superintendent of Pennsylvania, or its duly authorized agent.[7] It also provided for cancellation on ninety days notice in writing by either party and forthwith by Pennsylvania if and when, in the opinion of the General Agent and Superintendent, Western failed to perform any obligation cast upon it, or should fail to promptly and adequately maintain every part of the property therein included, or to operate said facilities in compliance with its requirements and should continue so to do for five days after notice in writing from the General Agent and Superintendent.[8]

| 6 Location | Date of Original Contracts |
|---|---|
| Erie, Pennsylvania | December 1, 1926 |
| Canton, Baltimore, Maryland | May 14, 1927 |
| Girard Point, Philadelphia, Pennsylvania | May 12, 1927 |
| Canton, Baltimore, Maryland | July 30, 1929 |
| Greenville, Jersey City, New Jersey | August 26, 1937 |

[7] Paragraph Second of Contract of May 14, 1927,

"Second: The Contractor shall at its sole cost and expense operate each and all of the properties and facilities included within the area, the limits of which are shown outlined in red on the said plan, and shall operate said facilities in a prompt and workmanlike manner, and without preference or partiality towards the grain of any shipper or person whomsoever, and shall at all times afford equal facilities to all shippers without discrimination.

"It is expressly understood and agreed that the operation of the said grain elevator, appurtenances and appliances, and all matters pertaining thereto, including the placement of vessels, lighters and barges at the said pier, for loading, shall be under the supervision and control of the General Agent & Superintendent of the Railroad Company, or his duly authorized Agent."

Paragraph Thirteenth of Contract of May 14, 1927,

" * * * It is further mutually understood and agreed that the above services will be performed only by and under the direction of said General Agent & Superintendent of the Railroad Company, or his duly accredited Agent, * * *."

[8] Paragraph Fourteenth of Contract of May 14, 1927,

"Fourteenth: This agreement shall take effect as of the fifteenth day of May, A.D.1927, and shall continue in effect for a period of one year from that date, and shall continue thereafter from year to year with the right of either party hereto upon not less than ninety (90) days notice in writing, served or given to the other, to terminate this agreement at the end of any such fiscal year; provided, however, that in the event said Contractor shall fail to promptly observe and perform any of the conditions and obligations herein cast upon him or shall in the opinion of the said General Agent & Superintendent of the Railroad Company refuse or fail to promptly and adequately maintain, repair and renew each and every part of the property and facilities herein included, or shall decline or fail to operate said facilities in compliance with the requirements of the said General Agent & Superintendent of the Railroad Company, and shall continue to refuse, decline or fail therein for a period of five (5) days after notice in writing from said General Agent & Superintendent requiring the same, then said Railroad Company shall have the right forthwith upon notice in writing, to terminate this agreement; and provided further, that if legal or other reason shall arise over which the Railroad Company has no control, and which in the opinion of the said General Agent & Superintendent of the Railroad Company, or of the General Counsel of the Railroad Company, sufficiently affects the value or validity of this contract or any operation thereunder, then the Railroad Company, shall have the right upon thirty (30) days notice in writing, served or given to the said Contractor, or such shorter notice as in the opinion of the General Counsel of the said Railroad Company may be advisable to terminate this agreement; and in the event of termination

486

Various modifications were made to the original contracts affecting the operations in the different locations, which in my opinion were not controlling on the issue here involved,[9] until January 2, 1940, when all of the original and modifying contracts were cancelled and new contracts entered into, one for the operation of Pennsylvania's grain elevator at Girard Point in the City of Philadelphia, Pennsylvania; one for the operation of Pennsylvania's elevator and floating elevator at Canton in the City of Baltimore, Maryland; one for the operation of Pennsylvania's transfer elevator at Greenville in the City of Jersey City, New Jersey, and one for the operation of Pennsylvania's elevator at Erie, Pennsylvania. All of these contracts were, so far as material here, similar in their terms. All of them omitted the provisions of the contracts which they superseded giving the General Agent and Superintendent of Pennsylvania the right to supervise and control the work of Western, and giving Pennsylvania the right to terminate the agreement in case Western should, in the opinion of the said General Agent and Superintendent, fail to perform any provision of the agreement, and making the latter's decision with respect to the subject matter of the agreement or anything done or to be done in connection therewith conclusive upon Western. On the contrary, the new contracts provided that Western should be and remain an original, private and independent contractor thereunder, should furnish all labor and supervisory forces of every kind and description, should employ, pay from its own funds and discharge all persons engaged in the performance of the work to be done by Western thereunder.[10] As to the matter of termination, the new

of this agreement under any of the conditions herein provided for, then all rights of the said Contractor hereunder shall wholly cease and determine, and the said Contractor shall quit and deliver up possession of the said premises to the Railroad Company."

[9] Decision Social Security Board, August 11, 1945, Cases Nos. 3—413, 3—414, 3—415, Hannah Martin et al., Page 6, found:

"Since the contractor was losing money under these agreements, their terms, with respect to the compensation to be paid the contractor, at least for the operations at Philadelphia and Baltimore, were modified on April 23, 1930, to provide as follows:

" '1. The Western Stevedoring Co. will be reimbursed for the actual expense of operating the facilities in question, with the understanding that the operations will continue to be conducted in a most economical manner; no addition to the force or increase in rates paid labor to be allowed without first obtaining authority from the designated representative of the railroad company.

" '2. The Western Stevedoring Company will be allowed five mills per bushel of grain unloaded and elevated as their compensation for supervising the operations.'

"A similar method of compensating the contractor was incorporated in a new agreement executed on May 20, 1930 for the operation of the Erie elevator."

The Board, as hereinafter indicated, stressed the fact that by the modifications Pennsylvania had unquestionably

the right to control the number of persons to be employed by Western and their rate of pay and accordingly concluded Western was subject to the control of Pennsylvania. I am of the opinion that whether Western was paid under the various contracts on a unit basis or a cost plus basis had absolutely no relation to the ultimate question of control. The above modification was made because Western was losing money. Pennsylvania was interested, purely from a cost standpoint, that Western should not because of an unbalanced labor situation, continue to lose money and thus be obliged to request a further increase allowance per bushel of grain handled. It definitely resolved itself into a question of cost.

[10] Paragraph First of Contract of January 1, 1940,

"First: The Contractor will at its sole cost and expense operate each and all of the properties and facilities covered herein, or such of them as from time to time may be necessary, in a prompt and workmanlike manner; and without injust (sic) discrimination will furnish at all times equal available services and facilities to all patrons whose grain may be handled at the properties in question. In the performance of such work the Contractor will furnish all labor and supervisory forces of every kind and description; and it is expressly understood and agreed that the Contractor shall be and remain an original private and independent contractor hereunder, and shall employ, pay from its own funds and discharge all persons en-

contracts provided for arbitration of any unreconcilable controversy between the parties,[11] the right to either party to terminate at any time on ninety days written notice to the other party, and finally, in the event Western should for any reason whatever fail or refuse to perform any of the conditions and obligations cast upon it or to perform any of the work thereunder or any part thereof, then and in that event and because of the common carrier obligations of Pennsylvania the agreement might be forthwith terminated by Pennsylvania upon service upon Western of notice to that effect.[12]

---

gaged in the performance of the work to be done by the Contractor hereunder; and all such persons shall be and remain the sole employees of the Contractor and subject to its exclusive authority, supervision, direction and control. Any person who is engaged by the Contractor and paid by the Contractor shall be considered an employe of the Contractor."

[11] Paragraph Tenth of Contract of January 1, 1940,

"Tenth: If at any time a controversy shall occur concerning any matter or thing contained in this contract upon which the parties hereto are unable to agree, shall (sic) matter shall be referred to an Arbitration Board to be composed of three (3) competent and disinterested men, one arbitrator to be chosen by the Railroad and one to be chosen by the Contractor and the third by the two so chosen. If either party shall fail to choose its arbitrator within ten (10) days after the party desiring arbitration has chosen its arbitrator and given written notice to the other party of such choice, the name of the arbitrator and the matter to be arbitrated, then the arbitrator so chosen shall choose an arbitrator for the defaulting party and the two so chosen shall choose a third arbitrator to completed (sic) the Board as above provided. If the arbitrators so chosen shall fail to choose the third arbitrator within ten days after the selection of the second arbitrator as aforesaid, then either party without notice to the other may apply to any judge of the United States District Court in and for the Western District of Pennsylvania to appoint the third arbitrator and the arbitrator so appointed by the said Judge shall be the third arbitrator. Such board so chosen in either of said ways shall promptly decide the dispute, and the determination of said arbitrators so chosen in either of said ways, or a majority of them, shall be the (sic) final and conclusive as between the parties hereto upon the matter concerning which arbitration was demanded. The fees and expenses of such arbitrators shall be borne by the party against which the decision of said arbitration board shall be rendered, provided that if a divided award be made, said expenses shall be borne by the parties hereto equally, or in such proportion as shall be fixed by said Arbitration Board."

[12] Paragraph Twelfth of Contract of January 1, 1940,

"Twelfth: This agreement shall become and be effective as of its date, and shall continue in force and effect for a period of one (1) year from the date hereof and thereafter from year to year unless terminated at the end of any such yearly period by either party upon notice prior to the end of any such yearly period of not less than ninety (90) days in writing to the other; provided, however, that in the event the Contractor shall fail or refuse to perform any of the conditions and obligations passed upon it, or to perform any of the work hereunder or any part hereof, unless prevented from so doing because of any law or other authority, Federal or State, ordinance or any act of any municipality, or any act of any regulatory body made pursuant to law, or as a result of strike, fire, shortage of cars, labor conditions, or other causes beyond the control of either party, then and in that event, and because of the common carrier obligations of the Railroad Company, this agreement may be forthwith terminated by the Railroad Company upon service upon the Contractor of notice to that effect. And these provisions shall apply to any assignee consented to hereunder.

"Also, in the event of voluntary or involuntary general or other assignment of the Contractor, of any assignee consented to hereunder, for the benefit of creditors, or upon the taking or happening of any legal proceeding against the Contractor, or any assignee consented to hereunder, in bankruptcy or reorganization or receivership or otherwise, this agreement may at its option be forthwith (sic) terminated by the Railroad Company upon service upon the Contractor or such assignee of notice to that effect.

"Any termination under this article shall be without release of the Contrac-

The Board held:

"On the basis of substantially the same evidence we previously held[13] that the contractor was subject to the control of the railroad company prior to January 2, 1940 but that subsequent to that date it has not been subject to the control of the railroad company. However, upon a reconsideration of the entire matter we have concluded that our previous decision with respect to the period subsequent to January 1, 1940, is erroneous." [14]

The Board found that Western was at all times, indirectly if not directly, controlled by Pennsylvania regardless of the omission in the 1940 contracts of the supervision and control provisions of the earlier contracts; that while under the modification of the earlier contracts Pennsylvania unquestionably had the right to control the number of persons to be employed by Western and the rate of pay.[15] the fact as to whether or not such control was ever exercised by Pennsylvania was immaterial; that Pennsylvania was practically the sole source of income of Western; that the authority given by the 1940 contracts to Pennsylvania to terminate the contracts forthwith for cause as stated had the practical effect of enabling Pennsylvania to dominate Western,[16] and therefore concluded that Western had at all times been and still was controlled by Pennsylvania; that Western had since December 31, 1936, been an "employer" within the meaning of the statutory definition and that therefore the services rendered by the wage earner for Western were excepted from employment by the provisions of Section 209(b) (9) of the Social Security Act, as amended; that the wage earner was neither

---

tor or any assignee consented to hereunder with respect to any obligation or liability already accrued or which may result from the terms of this contract; but any such termination shall be without liability to the Railroad Company because of any damage whatsoever to the Contractor or any assignee consented to hereunder, including any damages which incidently may arise out of such termination because of expectable or anticipated profits. And any notice of termination as to the Railroad Company shall be served in writing upon its General Manager located at Pittsburgh, Pennsylvania, and as to the Contractor upon its President located at Philadelphia, Pennsylvania, and in the case of any assignee consented to as provided herein, upon such assignee, or in the case of absence of any of these parties, upon the person in charge of its or his office.

"No breach of any of the terms or conditions of this agreement or failure to enforce the same shall be deemed or construed to be a waiver of any such terms or conditions."

[13] Decision of Social Security Board, August 11, 1943, Cases Nos. 3—159, 3—160, William H. German, et al.

[14] Decision of Social Security Board, August. 11, 1945, Cases Nos. 3—413, 3—414, 3—415, Hannah Martin et al., Pages 9 and 10.

[15] See Note 9.

[16] No reference is made here to the termination clause in the various contracts; nor to the fact that 1940 contracts omitted provisions of the earlier contracts giving Pennsylvania the right to terminate the agreement in case Western should, in the opinion of Pennsylvania's General Agent and Superintendent, fail to perform any provision of the agreement and making the latter's decision with respect to the subject-matter of the agreement or anything done or to be done in connection therewith conclusive on Western; nor to the inclusion in the 1940 contracts of the arbitration clause for the first time; nor of the clause in the later contracts, because of its common carrier obligations, giving Pennsylvania the right to terminate the agreement forthwith in the event Western should for any reason fail or refuse to perform any of the conditions or obligations cast upon it or to perform any of the work thereunder. I am of the opinion that the right of termination during the progress of the work is neither influential or controlling. The very nature of the work necessitated a provision of this kind. Pennsylvania's job was to transport freight. Western's failure or refusal to perform would be no justification for Pennsylvania. It is both essential and proper that Pennsylvania retain the right of cancellation in order that the movement of commerce might not be stopped. Chicago, Rock Island & Pacific Railway v. Bond, 240 U.S. 449, 36 S.Ct. 403, 60 L.Ed. 735.

I am, therefore, of the opinion that such cancellation rights for the protection of Pennsylvania, under its common carrier obligations to customers, had absolutely no connection with or bearing on the question of whether or not Western was an independent contractor.

fully nor currently insured at the time of his death; that the claimant was not entitled to widow's current insurance benefits and child's insurance benefits on behalf of Joseph H. Martin and Patricia L. Martin, for which application was made.

Defendant takes the position that the question whether Western was controlled by Pennsylvania during the entire period in which the wage earner's services were performed, in such a way as to insure that Western's operations would be conducted in the interest of Pennsylvania, is a question of fact; that the Social Security Board had found that Western was so controlled; that in its opinion its conclusion is supported by substantial evidence; that accordingly the Board's finding that the services fell within the special system of social insurance for the railroad industry is conclusive upon the courts. It predicates this contention on Section 205(g) of the Social Security Act, as amended, 42 U.S.C.A. § 405(g), which provides, in part, that "the findings of the Board as to any fact, if supported by substantial evidence, shall be conclusive, * * *."

█ I am fully appreciative of the fact that the expert judgment of the Social Security Board[17] and long administrative interpetation of the Revenue Code[18] is entitled to great weight. Certainly here, as evidenced by the Board's reversal of its position on the basic and fundamental question of control, the impressiveness of long and consistent administrative interpretation is lacking.

As to the contention that the administrative decision of the Social Security Board should be treated as conclusive, the Supreme Court in Social Security Board v. Nierotko, supra, had this to say;

"* * * There is a suggestion that the administrative decision should be treated as conclusive, and reliance for that argument is placed upon National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 130, 64 S.Ct. 851, 860, 88 L.Ed. 1170, and Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326, 332, 86 L.Ed. 301. In the acts which were construed in the cases just cited, as in the Social Security Act, the administrators of those acts were given power to reach preliminary conclusions as to coverage in the application of the respective acts. Each act contains a standardized phrase that Board findings supported by substantial evidence shall be conclusive. The validity of regulations is specifically reserved for judicial determination by the Social Security Act Amendments of 1939, sec. 205(g).

"* * * The very fact that judicial review has been accorded, however, makes evident that such decisions are only conclusive as to properly supported findings of fact. * * *"

█ In this case the fundamental facts are not in dispute. The Board originally found on this admitted factual situation no control, subsequently it reversed itself and on the same factual situation throughout the entire period involved found control. I am of the opinion that any construction of this basic jurisdictional question goes beyond the limits of administrative determination. An Administrative agency may not finally determine the scope of its statutory power, that is a judicial question.[19]

█ Was Western at the time the services in question were performed an "employer" within the meaning of Section 1532 (a) of the Internal Revenue Code, which is a part of Chapter 9(B), otherwise known as the "Carriers Taxing Act"?[20] If it

---

[17] Social Security Board v. Nierotko, 327 U.S. 3.8, 368, 66 S.Ct. 637, 642, 90 L.Ed. 718, 162 A.L.R. 1445; Sanford's Estate v. Commissioner, 308 U.S. 39, 52, 60 S.Ct. 51, 84 L.Ed. 20.

[18] McDermott v. Commissioner, 80 U.S.App.D.C. 176, 150 F.2d 585, 588.

[19] Social Security Board v. Nierotko, supra.

[20] Sec. 1532 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 1532, provides, in part, as follows:

"(a) Employer. The term 'employer' means any carrier (as defined in subsection (h) of this section), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service * * * in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or

was, services of its employees would be excluded by Section 17 of the Railroad Retirement Act of 1937[21] and Section 209(b)(9) of the Social Security Act, as amended in 1939,[22] from employment as defined by that Act and consequently the wage earner was neither fully nor currently insured at the time of his death under the provisions of the Social Security Act.

By the Carriers Taxing Act the term "employer" is generally defined as a "carrier" or any company which is directly or indirectly owned or controlled by a carrier. There is no question that Pennsylvania here is a carrier and consequently an employer within the terms of the Act. The same Act defines an "employee" as "any person in the service of one or more employers for compensation," and provides further that "an individual is in the service of an employer * * * if he is subject to the continuing authority of the employer to supervise and direct the manner of rendition of his service, which service he renders for compensation."

Following the reasoning, and adopting in part the language of the United States Court of Claims in Pennsylvania Railroad Co., A Corporation, v. United States, 70 F.Supp. 595, involving a situation very similar to the instant case, there can be no question that the decedent here rendered services for compensation and that such services were an integral part of Pennsylvania's service as a common carrier of freight in transit. It is also true that if Pennsylvania had caused this service to be performed without the intervention of contracts of the character here involved, the individual performing those services would have been considered as an employee within the meaning of the Carriers Taxing Act. It is conceivable that this type of freight handling work, certainly in the first instance the responsibility of Pennsylvania, might have been handled directly by Pennsylvania. It elected not to so handle it. It rather chose to delegate the work to a concern with a personnel specially trained therein. There can be no doubt that the work of a stevedore does call for training and experience of a type separate and distinct from that of ordinary railroading. It is, therefore, probably for that reason that it seems to be the common practice of railroads to delegate this work to stevedoring companies. Pennsylvania here followed that practice and by contract did delegate that work to Western. The plaintiffs maintain that Western was an independent contractor and that the decedent employed by Western to perform these stevedoring services was an employee of Western and not an employee of Pennsylvania for the reason that he was not subject to the continuing authority of Penn-

---

icing, storage, or handling of property transported by railroad * * *.

"(b) Employee. The term 'employee' means any individual in the service of one or more employers for compensation: * * *

"(h) Carrier. The term 'carrier' means an express company, sleeping-car company, or carrier by railroad, subject to part I of the Interstate Commerce Act."

[21] Railroad Retirement Act of 1937, Sec. 17, 50 Stat. 317,

"The term 'employment', as defined in subsection (b) of section 210 of title II of the Social Security Act, shall not include service performed by an individual as an employee as defined in section 1(b)."

[22] Social Security Act, Title II, Section 209(b), 42 U.S.C.A. § 409(b),

"(b) The term 'employment' means any service performed after December 31, 1936, and prior to January 1, 1940, which was employment as defined in section 410(b) of this chapter prior to January 1, 1940 (except service performed by an individual after he attained the age of sixty-five if performed prior to January 1, 1939), and any service, of whatever nature, performed after December 31, 1939, by an employee for the person employing him, irrespective of the citizenship or residence of either, (A) within the United States, or (B) on or in connection with an American vessel under a contract of service which is entered into within the United States or during the performance of which the vessel touches at a port in the United States, if the employee is employed on and in connection with such vessel when outside the United States, except—
* * *

"(9) Service performed by an individual as an employee or employee representative as defined in section 1532 of Title 26;"

sylvania to supervise and direct the manner of rendition of his services. I agree.

To quote from the opinion last above referred to:[23]

"The Statute says that an individual is an employee of a given employer if he is subject to the authority of the employer 'to supervise and direct the manner of rendition of his service.' A reasonable construction of this language is that the employer must have the right to supervise and direct the details of the work which the employee is called upon to perform. The most that can be said under the contracts with respect to authority for supervision by plaintiff is that the work performed by the Jersey Contracting Corporation shall be satisfactory to plaintiff, which means that the control reserved to plaintiff related to the results obtained and not as to the manner in which the services were performed in obtaining those results."

That, in my opinion, was the precise situation here.

The question posed here is whether services performed by the wage earner for Western from 1937 to 1944 were covered employment under the Social Security Act, or were excluded as services performed as an employee under Section 1532 of the Internal Revenue Code by Section 209(b) (9) of the Social Security Act, 42 U.S.C.A.

§ 409(b) (9); it is therefore one primarily of statutory construction. Unquestionably there is here a case falling within some phase of the social legislative program.

Social Security taxes were paid in this case during the entire period of the employment. The Social Security Board, in a prior case[24] involving Western and practically the same set of facts, held Western subsequent to January 2, 1940, to be an independent contractor and that the remuneration received by the wage earner after that date was "wages" within the meaning of the Social Security Act, as amended. Subsequently thereto, and after the death of the wage earner in the instant case, the Board reversed its position and held that at all times Western had been and still is controlled by Pennsylvania. That therefore Western has since December 31, 1936, been an "employer" within the meaning of the definition enunciated in Section 1532 of the Internal Revenue Code (Carrier Taxing Act), and that in consequence thereof, the services rendered by the wage earner for Western are excepted from employment by the provisions of Section 209(b) (9) of the Social Security Act, as amended. In thus reversing its position the Board was undoubtedly influenced by the Opinion of the General Counsel of the Railroad Retirement Board under the date of May 31, 1944,[25] in which he assumed jurisdiction

---

[23] The Pennsylvania Railroad Co., a Corporation v. United States, 70 F.Supp. 595, 602, United States Court of Claims. Here the plaintiff sued to recover taxes paid by it pursuant to the Carriers Taxing Act of 1937 and amendments thereto (50 Stat. 435) with respect to compensation for personal services paid by the Jersey Contracting Corporation. The corporation had performed work for plaintiff (Pennsylvania Railroad Company) in loading and unloading cars and vessels and transferring freight between cars, vessels and platforms at Jersey City and Greenville, New Jersey. Taxes were paid by Pennsylvania, under protest, on the compensation of individuals employed by Jersey. The Commissioner of Internal Revenue disallowed claims for refund on the ground the individuals employed by Jersey to perform services under its contract with Pennsylvania were employees of Pennsylvania within the meaning of the Carriers Taxing Act. Railroad Retirement Board also found the employees thus employed

by Jersey were employees of Pennsylvania for the purpose of Federal employment insurance and retirement benefits. The Court (four judges) unanimously held that the individuals employed by Jersey for the performance of the work involved were not employees of Pennsylvania within the meaning of the Carriers Taxing Act. There is a marked similarity in the factual situation of the Jersey case to the instant case. I am in full and complete accord with the reasoning and conclusion of the Tax Court.

[24] William H. German et al., supra.

[25] Memorandum

General Counsel, Railroad Retirement Board to Director of Retirement Claims, under date of May 31, 1944

Subject—Western Stevedoring Company

Caption No. L–44–297

M–172

Opinion No. 1944 U.I. 1

Opinion No. 1944 R.R. 6

492

over Western on the theory that Western in the operation of Pennsylvania's grain elevators was a common carrier by railroad subject to Part 1 of the Interstate Commerce Act and therefore an "employer" within the meaning of the Railroad Retirement and Railroad Unemployment Insurance Acts and also that Western was controlled by Pennsylvania within the meaning of Section 1(a) of the Railroad Retirement and Railroad Insurance Acts, 45 U.S.C.A. § 228a(a), and accordingly was an "employer" under the said acts as a company controlled by a "carrier employer" and performing services and operating facilities in connection with railroad transportation.

In endeavoring to fit a certain factual situation into its proper statutory framework one cannot be unmindful of the broad over-all objective of the particular statute or statutes involved. Here we have the impact of a group of so called social program statutes that should not be made the subject of technical juggling.

At an early stage of the present proceedings, and appreciative of the fact that the determination of the question presented would affect the Railroad Retirement Board, the Collector of Internal Revenue and Western, as well as the plaintiffs and defendant, the Court suggested that such parties should be interpleaded before decision was rendered in order that they might be afforded opportunity to take such action as they might deem advisable under the circumstances. Both of the named agencies, in answer to the suggestion, contended in effect that, although desirable, to add the parties through the compulsion of process as distinguished from voluntary participation might not only be impossible but might represent a radical departure from the statutory scheme of Title II of the Social Security Act, 42 U.S.C.A. § 401 et seq., and also from the finality to which administrative determinations of the Railroad Retirement Board are entitled when they are challenged in the exclusive way permitted by Congress. Nor did the parties see fit to appear voluntarily.[26]

In Allen v. Ocean Steamship Co. of Savannah, 5 Cir., 123 F.2d 469, 470, where

[26] At all times during the years in question in this proceeding the deceased wage earner was the subject of Social Security Account No. 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, and all taxes under the Social Security Act were, at all times during said period, paid on his earnings. Under date of January 16, 1945, Western was advised that the Commissioner of Internal Revenue had held Western an employer for the purposes of the Carriers Taxing Act of 1937, sub-chapter B of Chapter 9 of the Internal Revenue Code. Western then requested relief under Section 3791(b) of the Internal Revenue Code, 26 U.S. C.A. Int.Rev.Code, § 3791(b), by a non-retroactive application of the ruling. Under date of December 14, 1945, Western was advised by the Commissioner that inasmuch as a completely retroactive application of its January 16, 1945, ruling would result in substantial hardship being imposed upon Western and its employees, the said ruling would be applied without retroactive effect to the extent that (1) Western would not be required to pay employers' tax under Carriers Taxing Act of 1937 or Sub-chapter B of Chapter 9 of the Code for the taxing periods prior to July 1, 1939, and (2) Western would be required to pay employers' tax under such act and Sub-chapter B for the taxable periods prior to January 1, 1945, only to the extent that such tax was collected by Western from its employees, that the granting of the relief in no way contemplated the refunding of employers' tax or employees' tax paid under such Act or such Sub-chapter B, or the refunding of any portion of the taxes paid under Sections 801 and 804 of the Social Security Act and Sections 1400 and 1410 of the Internal Revenue Code, 26 U.S. C.A. Int.Rev.Code, §§ 1400, 1410, for the period January 1, 1937, to December 31, 1944, both dates inclusive; requiring further that Western file return under Carriers Taxing Act of 1937 and Sub-chapter B of Chapter 9 of the Internal Revenue Code for the period January 1, 1937, to December 31, 1944, both dates inclusive, crediting thereon, in accordance with the provisions of the Carriers Taxing Act of 1937, Section 1422 of the Internal Revenue Code, 26 U.S. C.A. Int.Rev.Code, § 1422, Article 703 of Regulations 100, and Sections 402.706 of Regulations 106, the taxes paid under Title VIII of the Social Security Act and Sub-chapter A of Chapter 9 of the Internal Revenue Code for such period.

In spite of this labyrinth of contradiction and confusion, a creature of their own making, the agencies refused to appear.

the question involved was whether a steamship carrier owned by a railroad was subject to the provisions of the Carriers Taxing Act, 45 U.S.C.A. §§ 261–273, and where, as here, the administrative agencies given jurisdiction to determine the questions involved in the first instance had reversed themselves and given expression to conflicting views, the Court said:

"* * * When the act was first adopted and appellee's general counsel inquired of the Social Security Board, the Railroad Retirement Board and the Commissioner of Internal Revenue, whether in their opinion, the company fell under Title 8 of the Social Security Act, 42 U.S.C.A. § 1001 et seq., or under the Carriers Taxing Act, the Company was advised by the Chairman of the Railroad Retirement Board, that it was not an employer under the Carriers Taxing Act. A year later the Commissioner of Internal Revenue gave it, as his opinion, that plaintiff was under the act. Nearly a year later still, the general counsel of the Railroad Retirement Board, in a lengthy opinion, took the Commissioner's view while in an opinion equally lengthy, filed a little later, the general counsel of the Social Security Board disagreed with the Commissioner. It is thus quite apparent, with different agencies of the government in a contest with each other over which shall take jurisdiction over and administer upon a citizen, under a statute designed to advise him at once of his duties and his rights, that it is only in a Pickwickian sense that appellant declares that the terms of the invoked act quite plainly bring appellee under it. More it is a strong argument for giving the statute a broad common-sense construction rather than a narrow one, sounding in mere logomachy. * * *"

It is significant that when by Act of July 31, 1946, Public Law 572, 60 Stat. 722, Congress amended the Railroad Retirement Acts, 45 U.S.C.A. § 228a et seq., the Railroad Unemployment Insurance Act, 45 U.S.C.A. § 351 et seq., and Sub-chapter B of Chapter 9 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 1400 et seq., the coverage provisions of the then existing legislation, under which a company other than a carrier must be engaged in rail transportation operations and be directly or indirectly owned or controlled by a carrier or under common control therewith to be included in Railroad Retirement coverage and concurrently excluded from Social Security benefits, were left unchanged. The debate in the Senate on the amendment clearly indicates that a situation such as we have here was very much in the Congressional thought. As a matter of fact, the amendment as it originally passed the House did include a much broader and more comprehensive coverage under the Railroad Retirement Act. Such increased coverage provision was rejected by the Senate, and the amendment finally passed as above indicated.[27]

Defendant argues that this is not significant, that the existing definition of "employer" includes companies which are owned or controlled by a carrier by railroad and which performs services in connection with the transportation of passengers or property

[27] The rejected amendment read as follows:

"Any person, other than a carrier regulated under part I of the Interstate Commerce Act, which, pursuant to arrangements with a carrier or otherwise, performs, for hire, with respect to passengers or property transported, being transported, or to be transported by a carrier, any service included within the term 'transportation' as defined in section 1(3) of the Interstate Commerce Act, whether or not such service is offered under railroad tariffs;"

Senate Report No. 1710 delivered by Mr. Barkley with respect to the effect of this Amendment, after it was passed by the House but before it was rejected by the Senate, with which the House later concurred, said:

"Coverage.—The bill in section 1, redefines the term 'employer' by spelling out in more detail the application of the act to companies and associations that are a part of the railroad industry but are not technically 'carriers.' It was the purpose of the present law to cover not only technical 'carriers' but all other elements in the railroad industry such as railroad subsidiaries engaged in performing service in connection with railroad transportation, railroad associations, tariff bureaus, demurrage bureaus, railway labor organizations, and so forth."

by railroad, and adverts to its original premise that the only issue here is whether Western is controlled by Pennsylvania.

During the debate in the Senate on the amendment, the Jersey Contracting Corporation case, supra,[28] was specifically mentioned as being then in the Courts, undecided, "and the rights of the employers in question to benefits under the Act have changed from a reality intended by the Act to a question mark."

The Court of Claims in its opinion in the Jersey case, supra, distinguished that case from cases like National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, which involved newsboys who sold newspapers under supervision of the publisher but whose compensation was measured by the profit on the papers sold, and United States v. Vogue, Inc., 4 Cir., 145 F.2d 609, which concerned seamstresses working at home and paid on a piecework basis because in those cases not only did there exist authority for supervision and direction within the one held to be the employer, but also there was no intervening employer such as in the Jersey case. The Court then quotes from the opinion in Northern Pacific Railway Co. v. Reynolds, D.C., 68 F.Supp. 492, 494, as follows:

"* * * The question in both of those cases was whether the individuals involved were themselves independent contractors or 'employees'. That situation is not present here. The individuals affected here are employees of either the contractors or of the railroad and are within the coverage and protection of either the Social Security Act and the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., or they are governed by the special legislation enacted for railroad employees—that is, the Railroad Retirement Act of 1937, 45 U.S.C.A. § 228a et seq., the Railway Labor Act, 45 U.S.C.A. § 151 et seq., the Carriers Taxing Act of 1937, 26 U.S.C.A. Int.Rev.Code § 1500 et seq., and the Railroad Unemployment Insurance Act, 45 U.S.C.A. § 351 et seq. They cannot be within the scope of both schemes of legislation as they are mutually exclusive. * * *"

In Bartels et al. v. Birmingham, Collector of Internal Revenue for the State of Iowa, 67 S.Ct. 1547, the petitioners, operators of public dance halls sued to recover taxes paid under the Social Security Act, Titles VIII and IX, 42 U.S.C.A. §§ 1001 et seq., 1101 et seq., and Int.Rev.Code, c. 9, subchapter A and C, 26 U.S.C.A. Int.Rev. Code, §§ 1400 et seq., 1600 et seq. Recovery depended on whether petitioners' arrangements for bands to play at the dance halls made the band leaders and other members of the bands employees of the petitioners or whether, despite the arrangements, the leaders were independent contractors and therefore themselves the employers of the other members. The employment was predicated on a contract which stated that the ballroom operator was the employer of the musicians and their leader and "shall at all times have complete control of the services which the employees will render under the specifications of this contract." The trial Court found that the leader exercised complete control over the orchestra; that he fixed the salaries of the musicians, paid them, and told them what and how to play; that he provided the sheet music and arrangements, the public address system, and the uniforms; that he employed and discharged the musicians; that he paid the agents' commissions, transportation and other expenses out of the sum received from the dance hall operators; that the operators furnished the piano but not the other instruments. It further held that the question of employment under the Act was one of fact, and that the contract was only one factor to be considered and concluded that the leader was an independent contractor employing the musicians, and awarded judgment in favor of plaintiff. The Circuit Court, 157 F.2d 295, reversed, holding that the test of the employment was the common law test of control, i.e., that one was an employer if he had the "right" to direct what should be done and how it should be done. It concluded that the contract between the parties gave the ballroom operators the "right" to control the musicians and the leader, whether or not the control was actually exercised (precisely

---

[28] Pennsylvania Railroad Co., A Corporation, v. United States, supra.

the position of the defendant in the instant case.) The Supreme Court in reversing the judgments of the Circuit Court and affirming those of the District Court, 59 F. Supp. 84, stated:

"The Government here relies entirely on the contract, conceding that otherwise the bandleaders are independent contractors employing the musicians. * * *"

"In United States v. Silk, supra, [67 S.Ct. 1463], we held that the relationship of employer-employee, which determines the liability for employment taxes under the Social Security Act was not to be determined solely by the idea of control which an alleged employer may or could exercise over the details of the service rendered to his business by the worker or workers. Obviously control is characteristically associated with the employer-employee relationship but in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service. In Silk, we pointed out that permanency of the relation, the skill required, the investment in the facilities for work and opportunities for profit or loss from the activities were also factors that should enter into judicial determination as to the coverage of the Social Security Act. It is the total situation that controls. * * *" 67 S.Ct. 1549.

The court concluded that the elements of employment marked the bandleaders as the employers rather than the proprietors of the ballrooms.

Treasury Regulation 90, promulgated under Title IX of the Social Security Act, Art. 205, provides, inter alia:

"* * * In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor, not an employee."

I therefore conclude that the facts in this case during the entire period covered by the employment of this wage earner unmistakenly indicate that Pennsylvania in its dealings with Western was only concerned with the results to be obtained; that for the period prior to January 1, 1940, or thereafter, not a solitary instance of the exercise of control over personnel or the manner of operation existed;[29] that at none of the times involved was Western controlled by Pennsylvania; that Western has not at any time since December 31, 1936, been an "employer" within the meaning of Section 1532(a) of the Internal Revenue Code; that the wage earner was fully and currently insured at the time of his death and that the claimant is entitled to widow's current insurance benefits and child's insurance benefits on behalf of Joseph H. Martin and Patricia L. Martin, under the provisions of the Social Security Act.

Accordingly, defendant's motion for summary judgment is denied, plaintiffs' motion for summary judgment is granted, and the decision of the Social Security Board dated August 11, 1945, is reversed and the cause remanded, 42 U.S.C.A. § 405(g) with direction to the Board to compute the benefits to which plaintiffs are entitled under the Act on the basis of the total wages earned since January 1, 1937, to wit, the sum of $12,798.-28, which sum shall be used in determining the amount of widow's current insurance benefits as provided in Section 202(e) of the Social Security Act, 42 U.S.C.A. § 402(c), payable to Hannah Martin, and child's insurance benefits as provided in Section 202 (c) of the Social Security Act, 42 U.S.C.A. § 402(c), payable on behalf of Joseph H. Martin and Patricia L. Martin.

Counsel for defendant will compute the benefits to which plaintiffs are entitled under the Act and submit same for approval to counsel for plaintiffs within thirty(30) days. Counsel for plaintiffs will thereupon draft and submit formal judgment in accordance therewith.

[29] For such additional emphasis as it may produce, it is pertinent to note that in the contract of January 1, 1940, the parties confirmed their previous course of conduct by specifically designating Western an "independent contractor."