## CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY *v.* BOND, ADMINISTRATOR OF TURNER.

### ERROR TO THE SUPREME COURT OF THE STATE OF OKLAHOMA.

No. 486.   Argued February 23, 1916.—Decided March 20, 1916.

One who is not an employé of an interstate carrier, but an independent contractor, cannot recover, nor can his representative, under the Employers' Liability Act, even if killed or injured while engaged in services in interstate commerce.

Although a certain direction or information may be given by the carrier to one contracting with it, if, as in this case, the contract is not the engagement of a servant submitting to subordination and subject momentarily to superintendence, but of one capable of independent action to be judged by its results, and the person so contracting controls the manner of the work done by himself and those employed by him, he is a contractor with, and not an employé of, the carrier within the meaning of the Employers' Liability Act.

A contract to shovel coal on a per ton basis, and with provisions assuming all risk and liability for injury to, or for death of, himself and persons employed by him, between an interstate carrier and an independent employer of labor who had other contracts for work with the same carrier and with other companies, *held,* not to be an evasion of the provision of § 5 of the Employers' Liability Act, that any contract or device for exemption of the carrier's liability under the act shall be void.

THE facts, which involve the application and construction of the Federal Employers' Liability Act and the validity of a judgment in an action thereunder, are stated in the opinion.

*Mr. R. J. Roberts,* with whom *Mr. J. G. Gamble, Mr. M. L. Bell, Mr. C. O. Blake* and *Mr. T. P. Littlepage* were on the brief, for plaintiff in error.

*Mr. John C. Moore* for defendant in error.

MR. JUSTICE MCKENNA delivered the opinion of the court.

Action for damages caused by the railway company by the killing of the deceased, William L. Turner, through the negligence, it is alleged, of the company. It was brought in the district court of Garfield County, Oklahoma, and invoked the benefits of the Employers' Liability Act of Congress of April 22, 1908 (35 Stat. 65), c. 149, as amended April 5, 1910 (36 Stat. 291), c. 143. The case was removed on petition of the railway company to the United States District Court for the Western District of Oklahoma and remanded by that court to the state court. There an amended petition was filed by plaintiff in the action, to which an answer was filed.

After answer the case was tried to a jury, which returned a verdict for the sum of $7,583.00, distributed in certain proportions among those dependent upon the deceased. Judgment was entered upon the verdict and sustained by the Supreme Court of the State.

The case went to the jury upon the effect of certain contracts between deceased and the company, whether he was the company's servant or a contractor with it, and whether, if he was the servant of the company, it was guilty of negligence or whether he was guilty of contributory negligence.

The facts are not much in dispute. The company is an interstate common carrier and its line runs through the limits of the City of Enid, Garfield County, State of Oklahoma. Within the city there are six parallel tracks which run nearly from the north to the south, bearing as they proceed a little to the west. At the south end near their termination are located coal chutes, into the pockets or tipples of which coal is shoveled from cars set on the chutes for the use of all engines, local and interstate. The City of Enid has the power to establish and

did establish by ordinance a speed limit of ten miles an hour for all trains within its limits, beyond which it was unlawful to proceed.

The relation of Turner to the railroad company was under two contracts, one dated November 1, 1910, the other October 1, 1911. In the first contract the railroad company is party of the first part and Turner party of the second part and is called "Contractor." The covenants of one are made the consideration for the covenants of the other, and Turner, as contractor, agrees first "to furnish all the labor required and necessary to handle; and (a) to handle all the coal required by the company at Enid, from either open or closed cars, or both, and to place the same in coal chute pockets of the company; to gather up all coal that falls from the coal chute pockets to the ground and place the same on cars or engines as desired by the company. (b) To break all coal to the size of four inch cubes or less before delivery to chutes for engine use and to unload all coal for stationary boilers. (c) To unload wood from cars to storage piles located on company's right of way in Enid. (d) To load cinders from the right of way to cars at points designated by the company. (e) To unload sand from cars furnished by the company at points designated by it.

2nd. The company agrees to pay for the services enumerated in certain designated numbers of cents per ton, or cord or yard, as the case may be, to be paid upon estimates and records of the company.

3rd. Contractor agrees to maintain a sufficient supply of coal in the coal chutes and break or crack all coal to suitable sizes.

4th. Contractor expressly assumes all liability for injuries to or death of persons in his employ or loss or injury to his property, whether caused by the negligence of the company, its agents or employees, and he covenants to save the company harmless on account thereof, or for

or on account of any injury to or death of any person employed by him when and while such persons may be in or about the cars, engines and tracks of the company, "and any injury to said contractor while performing any services under this contract which might be or have been delegated to his agent or employees." And the contractor expressly assumes all liability for injury to or death of third persons, including the employés of the company, occasioned by any of his acts, and the company shall not be liable to him in case of his death or injury while employed in the work set forth.

5th. Punctuality of performance is stipulated for; (6th) the contract to continue until terminated, as it may be by either party upon fifteen days' notice; (7th) or upon failure of contractor to perform his duties, at the option of the company, without being liable in damages therefor, of which failure the company shall be the sole judge; (8th) the company to furnish the necessary tools for the performance of the stipulated services.

9th. It is "agreed and understood that the contractor shall be deemed and held as the original contractor, and the railway company reserves and holds no control over him in the doing of such work other than as to the results to be accomplished."

10th. The company shall keep a record of all coal delivered and shall make settlements and pay the contractor for handling the coal upon the basis of such handling, and the contractor shall make daily reports of the cars unloaded by him and shall receive, collect and deliver to the duly authorized representative of the company a ticket from each engineman, hostler or other employee, showing the number of tons of coal delivered to any engine; (11th) payment of the work to be made monthly; and (12th) the contract and all the terms and conditions, rights and obligations thereof, to inure to the heirs, administrators, executors, legal representatives,

assigns and lessees of both parties, but assigning or sub-letting shall not be without the written consent of the company.

Under the other contract Turner was required to cooper all cars which the Round House foreman directed him to prepare to fit the cars to hold grain in transit, the foreman to be the sole judge whether the preparation was in accordance with the contract. The manner of preparation is detailed and the price to be paid therefor in cents, the company to furnish the materials.

There are provisions as in the other contract to save the company from liability to persons or property. The contract was to continue until terminated upon thirty days' notice.

This contract is pertinent only for illustration, and otherwise may be put out of view. The deceased was killed, it is the contention, while performing services under the first contract.

Turner had a contract with the Enid Mill & Elevator Company to unload coal, and, directly after 4 o'clock on the day he was killed, having finished a particular service at which he and one of his employés had been engaged, remarked that he would "go down and gather up the tickets and order a car of coal for the morning," and started down the tracks toward the chutes.

He next appeared about 5:25 o'clock at the cinder pile of the Enid Mill & Elevator Company at what is designated as the "White Mill," and there had a conversation with an employee of that company, and asked him, the employee, if he thought he would have enough coal for the boiler room to run until Monday night. While they were talking a passenger train signaled its approach to the station and Turner said, "That is 24; I must take my coal tickets to the freight house and turn them in and order coal for the chutes." He then started towards the freight house.

The trial court thought the testimony was indefinite of Turner's intention and hesitated to decide that he was engaged in services to the railway company rather than to the Enid Mill & Elevator Company, but finally left it to the jury to decide.

From the "White Mill" Turner passed along the tracks of the railroad and was seen by a witness walking between tracks 3 and 4 with his hands behind him, and while so walking and when he was at a point east of the north end of the freight house an engine and two box cars and a flat car, backing on the track to his left in the direction in which he was going, and running at about 25 miles an hour and in excess of the speed limit prescribed in the ordinance, ran over and killed him. It is a reasonable conjecture that the character of the day and the noise and confusion of the approaching passenger train so distracted his attention that he did not hear the approach of the backing cars and warning yells of the brakeman and apprehended no danger.

Besides excessive speed there were other elements of negligence by the company which the plaintiff relied upon.

We may pass by the assignments of error based on the rulings upon the evidence and in giving and refusing instructions. The determining consideration is the relation in which Turner stood to the company, whether he was an employee of it or an independent contractor.

The trial court submitted the question to the decision of the jury; the Supreme Court, considering the contract of November 1, 1910, hereinbefore set out, and certain testimony, decided that Turner was an employee of the company. The court said: "Not only did the contract reserve to the company the right to direct deceased in his work but it might be well to know, although we are only passing upon the face of the contract, that the company, pursuant to the power therein reserved, did that very thing, which confirms us in our opinion, gathered

from the face of the contract, that the same was not capable of execution without such direction and control. Such amounts to a practical construction of the contract by the company. Mr. Bowman, station agent and yardmaster of defendant, testified:

"'Q. From whom did Mr. Turner get instructions about handling work performed by him?

"'A. Under his contract, from me.

"'Q. You directed him what to do?

"'A. Yes, either me or my chief clerk.

"'Q. So that he was under your supervision and control all the time?

"'A. In so far as the contracts were concerned, yes, sir.

"'Q. He performed his duties in accordance with what you directed him to do?

"'A. Yes, sir.

"'Q. I will ask you if all this coal he handled for the chutes, if that was Rock Island coal?

"'A. Yes, sir.'"

To which testimony this must be added:

"'Q. Did you have anything to do with directing him in detail as to how he performed the terms of his contract?

"'A. No, sir.'"

We are unable to concur with the learned court in its conclusion. There was, it is true, and necessarily, a certain direction to be given by the company, or rather, we should say, information given to Turner. But the manner of the work was under his control, to be done by him and those employed by him. He was responsible for its faithful performance and incurred the penalty of the instant termination of the contract for nonperformance. This was only a prudent precaution, indeed, necessary in view of the purpose of his contract, which was to make provision for a daily supply of coal for the operation of the railroad. The power given was one of control in a sense, but it was not a detailed control of the actions of Turner or those of

his employees. It was a judgment only over results and a necessary sanction of the obligations which he had incurred. It was not tantamount to the control of an employee and a remedy against his incompetency or neglect.

The whole instrument shows system and particular care. It is not the engagement of a servant submitting to subordination and subject momentarily to superintendence, but of one capable of independent action, to be judged of by its results. And the covenants were suitable for the purpose, only consistent with it, not consistent with a temporary employment. This is manifest from the provision for payment, from the careful assignment of liabilities and the explicit provision that Turner "shall be deemed and held as the original contractor and the railroad company reserves and holds no control over him in the doing of such work other than as to the results to be accomplished."

The railroad company, therefore, did not retain the right to direct the manner in which the business should be done, as well as the results to be accomplished, or, in other words did not retain control not only of what should be done but how it should be done. *Singer Mfg. Co.* v. *Rahn,* 132 U. S. 518; *Railroad Co.* v. *Hanning,* 15 Wall. 649, 656; *Standard Oil Co.* v. *Anderson,* 212 U. S. 215, 227.

The case falls, therefore, under the ruling in *Casement* v. *Brown,* 148 U. S. 615, 622.

We do not think that the contract can be regarded as an evasion of § 5 of the Employers' Liability Act, which provides "that any contract, rule, regulation or device whatsoever, the purpose and intent of which shall be to enable any common carrier to exempt itself from any liability created by this act, shall to that extent be void: . . ."

Turner was something more than a mere shoveler of coal under a superior's command. He was an independent employer of labor, conscious of his own power to direct

and willing to assume the responsibility of direction and to be judged by its results. This is manifest from the contract under review and from the cooperage contract; it is also manifest from his contracts with the other companies to whose industries the railroad company's tracks extended. We certainly cannot say that he was incompetent to assume such relation and incur its consequences.

Thus being of opinion that Turner was not an employee of the company but an independent contractor, it is not material to consider whether the services in which he was engaged were in interstate commerce.

*Judgment reversed and case remanded for further proceedings not inconsistent with this opinion.*