### PENNSYLVANIA R. CO. v. ROTH.
### No. 10434.

Circuit Court of Appeals, Sixth Circuit.
July 14, 1947.
Writ of Certiorari Denied Nov. 24, 1947.
See 68 S.Ct. 208.

George H. P. Lacey, of Cleveland, Ohio (Squire, Sanders & Dempsey, George H. P. Lacey and Charles F. Clarke, Jr., all of Cleveland, Ohio, on the brief) for appellant.

C. C. Spangenberg, of Cleveland, Ohio (Harrison, Thomas, Spangenberg & Hull, M. C. Harrison, and C. Craig Spangenberg, all of Cleveland, Ohio, on the brief), for appellee.

Before HICKS, MARTIN, and MILLER, Circuit Judges.

MILLER, Circuit Judge.

The Pennsylvania Railroad Company appeals from a judgment rendered in favor of the plaintiff-appellee in an action to recover damages for personal injuries, brought under the provisions of the Federal Employers' Liability Act. Sections 51 through 60, Title 45 U.S.C.A. No question is raised as to the applicability of the Act.

Under date of May 14, 1942, the United States of America entered into a written contract with the appellant by which the appellant agreed to provide certain storage yards on the line of the railroad for the Government and to furnish the necessary labor and material to make them adequate for use, and to furnish the necessary personnel and equipment for guarding and protecting the property as was from time to time required by the Government. One of the storage yards was located at Crestline, Ohio, and was laid out upon a piece of farm land several miles from the general classification yards of the railroad. Eleven spur tracks were put down with adequate space between them for bulky loads for the purpose of operating this storage yard. The appellant, on March 1, 1944, entered into a contract with the Fritz-Rumer-Cook Company (hereinafter called the contractor), which provided for the following work to be done by the contractor:

"Unloading inbound cars; assembling and placing dunnage on ground for piling and storage of inbound shipments; removal from inbound cars and reconditioning of blocking materials; stenciling, marking and placing in storage in said yards, inbound shipments in accordance with Government requirements; removing from storage, and stenciling and remarking outbound shipments and the loading of same on railroad cars, properly blocked and banded, as required by the Government; furnishing blocking, banding, and other necessary material when requested by the Company, recoopering damaged cases; such other work incident to the aforesaid operations as may be requested by the Company."

Under its terms the appellant was to reimburse the contractor on a cost-plus-fixed-fee basis, based upon monthly statements submitted to and certified by the division engineer of the appellant. The contractor agreed to afford sufficient facilities for the inspection of the work and materials and to give access to its records for examination of the accounts for the purpose of determining the cost of the work, which, however, did not include the contractor's general supervision, general office expense, general overhead nor interest charges. Inside the storage yard the work of loading and unloading Government material was carried on by the contractor's employees under the supervision of its yard foreman, John Ohsner. Ohsner hired and fired the men who worked there, directed the Pennsylvania switch engines which entered the yard as to where to place and pick up cars for loading and unloading, and supervised the work. Harold Naus, freight agent of the appellant, was named as consignee of

the shipments arriving at the storage yard and signed a non-negotiable receipt for material upon arrival. From time to time the Government ordered the material in the yards forwarded by sending appropriate orders to Naus who transmitted them to Ohsner. Ohsner then supervised the loading of the material and directed its movement out of the yard. Government inspectors entered the storage yard at frequent intervals, inspected the work, and complained to Ohsner in instances where the work was not being done in accordance with Government requirements, such as merchandise not being piled properly or marked correctly. Following such complaints Ohsner changed the loading or the markings according to the instructions. The Government inspectors also filed with Naus its objections to the improper storage or unloading of material at an improper point, and Naus would then issue instructions to correct the trouble.

On August 8, 1945, the appellant gave formal notice to the contractor of the termination of the contract as of August 18, 1945, which date was later extended to such later date as would be necessary to complete the loading of 75 cars. On August 21, 1945, the contractor was loading on to a flat car for shipment to Columbus a large crane owned by it and which had been used in its operations under the contract. John Blancett, a car inspector for appellant, had explained to Ohsner the manner in which the car must be loaded in order to comply with the regulations of the Association of American Railroads and to be acceptable for transportation by the appellant, and was present while the loading was taking place. Blancett showed to Ohsner and to the men working under him diagrams in the book of regulations and from time to time made suggestions as to how the crane should be fastened. At each of the four corners of the freight car a cable was looped through the crane and down through stake pockets on the flat car. The ends of the cable were overlapped and clamped together forming a loose loop. An iron bar was then thrust through the loop and twisted until the cable became taut, at which time one end of the iron bar was pulled down and placed behind a cross-tie which was bolted to the flat car, where it was held in place by tension and by nailing spikes into the cross-tie and bending them down over the bar. Three of the four cables had been fastened. The fourth cable was being worked on. The physical work was being done by two employees of the contractor named Barney and Houser. The appellee, George Roth, another employee of the contractor, was standing on the ground beside the car. He testified that Blancett asked him "Hold that, twist and help hold it down, anchor it there," that he reached up got hold and helped hold it down, that Blancett then said, "Well, that is all. Leave it there. That is good enough," following which he let loose of the bar and started to step away from the car. Other evidence was to the effect that Barney and Houser at the same time also let loose of the bar which proved insecurely placed behind the cross-tie, with the immediate result that it slipped from under the tension control and whirled in a reverse twist. In whirling it hit Roth on the cheekbone underneath the left eye fracturing the cheekbone and so injuring the eye that it became necessary to completely remove it from its socket.

Appellee's amended complaint made two alternative claims. He alleged as his first cause of action that he was an employee of the Railroad Company and that his injuries were caused by the negligence of Blancett, appellant's employee. For his second cause of action he alleged that if it should be determined that he was not in the employ of the appellant and accordingly not subject to the Federal Employers' Liability Act, then his injury was caused by the negligence of the defendant and its failure to exercise ordinary care for his safety as an invitee upon the premises. At the close of the evidence appellant moved for a directed verdict under both causes of action. The District Judge overruled the motion as to the first cause of action and sustained it as to the second cause of action. He instructed the jury as a matter of law that the appellee Roth was at the time of the accident in the employ of the appellant, and left to the jury the questions of negligence and amount of damages. The jury returned a verdict for the appellee in the

amount of $14,000, upon which judgment was entered. The Court later overruled appellant's motion for judgment notwithstanding the verdict and in the alternative for a new trial, following which this appeal was taken.

Appellant's chief contention is that under the contract between it and the contractor the contractor had the status of an independent contractor with the necessary result that the appellee Roth was not an employee of the appellant and not covered by the provisions of the Federal Employers' Liability Act. It relies chiefly upon the ruling of the Supreme Court in Chicago, Rock Island & Pacific Railway Company v. Bond, Administrator of Turner, 240 U.S. 449, 36 S.Ct. 403, 60 L.Ed. 735. Appellee relies upon a recent decision of this Court in Cimorelli v. New York Central Railroad Company, 6 Cir., 148 F.2d 575, 577, which involved contractual situations very similar to the ones in the present case. In that case the Court held the injured employee to be an employee of the Railroad Company and pointed out the differentiating features between the facts in that case and in the Turner case. Appellant's counsel, recognizing the controlling effect on this appeal of the Cimorelli ruling, if that case and this one involve contractual relations and facts which are substantially similar, has carefully and ably analyzed the facts of both cases and has called to our attention several differences existing between the two cases. However, such differences do not appear to us to be sufficient to destroy the applicability of the ruling in the Cimorelli case. In that case the Court discussed various tests to be applied in determining whether one performing work for another occupied the status of an independent contractor or that of an employee, but plainly stated at the same time—"Each case must be decided on its peculiar facts and ordinarily no one feature of the relationship is determinative." In its overall estimate of the controlling facts in that case, it was pointed out that the employment of the contractor was general, that the number of cars to be unloaded or reloaded depended upon the demands of the business, that the work was to be done when, where and in the proportions as the needs of the Railroad Company might justify, that the Railroad Company controlled the place where the work was to be performed and in which there was a frequent movement of cars, and that no part of the premises was surrendered to the contractor. The opinion then stated— "The whole project involved many interdependent details, the control of any one of which could not be surrendered without disorganization of the whole. From the very nature of the work its performance could not be committed exclusively to the discretion of the Duffy Company." It then ruled that taking into consideration the circumstances surrounding the parties, the subject matter of the contract and the object intended to be accomplished by its performance, it was not the purpose of the parties that the work should be performed by the Construction Company as an independent contractor. Although differentiating details exist in the present case, the fundamental considerations referred to are just as present in this case as they were in the Cimorelli case. The contract between the appellant and the contractor is general and somewhat indefinite as to the exact nature of the work to be done by the contractor. It refers in general terms to unloading, assembling, stenciling, removing from storage and loading on railroad cars, and provides in several instances that such work is to be done in accordance with Government requirements. It concludes with the general provision "such other work incident to the aforesaid operations as may be requested by the Company." Ohsner, the contractor's general superintendent, made changes in the work as instructed by Government inspectors. Naus, the appellant's freight agent, following Government complaints, gave orders, changing the unloading or storing of freight. The freight cars to be loaded or unloaded moved into or out of the storage yard as the Railroad directed. Lighting and fire-fighting facilities were installed and maintained by the Railroad. The storage yard was guarded by railroad employees. On the whole, we believe that the situation in the present case is substantially the same as it was in the Cimorelli case, and that that ruling should ac-

cordingly be followed rather than the earlier ruling of the Supreme Court in the Turner case.

Appellant also contends that there was not sufficient evidence of negligence on the part of Blancett, its car inspector, to take the case to the jury. There would be more merit to appellant's contention on this point if we had before us only the testimony of Blancett. But Roth's testimony as to Blancett's participation in the loading of the crane goes considerably further than does Blancett's and is sufficient to sustain a conclusion by the jury that Blancett was directing the loading operations instead of merely inspecting them after the operation was completed, and that the instructions given by him in so directing the operations constituted negligence which directly caused the injuries complained of. The rule on this phase of the case has been liberally construed by the United States Supreme Court. Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520; Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Ellis v. Union Pacific R. R. Co., 329 U.S. 649, 67 S.Ct. 598. See also the two recent decisions of this Court in Highfill v. Louisville & N. R. R. Co., 6 Cir., 154 F.2d 874, and Hutchins v. The Akron, Canton & Youngstown R. R. Co., 6 Cir., 162 F.2d 189.

The judgment of the District Court is accordingly affirmed.