Everett L. TURPIN, Appellant,

v.

CHICAGO, BURLINGTON & QUINCY
RAILROAD COMPANY, Respondent.

No. 51026.

Supreme Court of Missouri,
In Banc.

Jan. 10, 1966.

Rehearing Denied Feb. 14, 1966.

Certiorari Denied June 20, 1966.
See 86 S.Ct. 1925.

Dwight Roberts, Homer R. Hines, Kansas City, for plaintiff-appellant.

Clyde J. Linde, Linde, Thomson, Van Dyke, Fairchild & Langworthy, Kansas City, for respondent.

EAGER, Judge.

This is a suit under the Federal Employers' Liability Act for personal injuries, filed by one claiming to be an employee of the Chicago, Burlington & Quincy Railroad Company. The jury found for plaintiff and awarded him $30,000. The trial court entered judgment for defendant pursuant to an after-trial motion on the ground that the evidence was insufficient to establish the fact that plaintiff was an employee of defendant; in the alternative it granted a new trial for error in giving Instructions 2 and 3 offered by plaintiff. Plaintiff appealed in due course. After the adoption of an opinion in Division One of this Court, the cause was transferred to the Court in Banc on the Court's own motion.

As already indicated, the issue here is whether or not plaintiff was an employee of the defendant at the time of his injury. We shall therefore direct our recital of the facts to that issue. The submissibility of the issue of negligence is not in question now. The plaintiff, approximately 42 years old at the time of his injury on March 11, 1961, had been a truck driver for Burlington Truck Lines, Inc., since August, 1957; as such, he belonged to the Teamsters' Union. Burlington Truck Lines, Inc., was incorporated in June, 1945; it acquired by purchase the assets and routes of a predecessor corporation, Burlington Transportation Company (organized in 1935) in so far as the transportation of freight was concerned, but did not take over its passenger or bus business. We shall often refer to it as "Truck Lines," but in the singular form. It acquired an ICC permit, and has since operated as a common carrier of freight, with approximately 9,000 miles of certificated routes in various midwestern and western states, serving the public generally, as does any other common carrier. At the time of plaintiff's injury it was operating approximately 2,100 pieces of equipment, including tractors, trailers and trucks, and it had approximately 1,500 employees. Its general office is in Galesburg, Illinois; the defendant Railroad owns all of its stock, but the Truck Lines operates as a wholly separate entity, with its own bank accounts, paying all its own taxes and expenses, hiring and firing its own employees, and keeping all its financial affairs separate from those of the defendant. Some members of its Board of Directors are officers of the Railroad. It rents terminal space at certain points, including Kansas City, in the freight houses or terminals of the Railroad, and it pays the Railroad a flat annual fee for furnishing claim and medical services and, to some extent, legal services. The Truck Lines negotiates its own labor contracts; it maintains approximately seven employees in its Kansas City Terminal office, including a dispatcher, and about 47 truck drivers and dockmen work for it out of that terminal.

We shall generally refer to the defendant as the "Railroad." It is a common carrier by rail operating over many of the midwestern and western states. About 1958 the so-called "piggy-back" hauling of highway trailers, loaded and unloaded, on railway flatcars began to develop as an important element in the railroad business. The Railroad owns a rather large terminal and freight house in Kansas City, and others elsewhere. It owns some highway trailers, but no tractors or motive equipment. By an exchange of letters, recognized by the parties as a contract, it agreed with Bur-

lington Truck Lines that it would pay to the latter a unit cost of $10.05 for the loading or unloading of each loaded trailer, which figure included the Truck Lines' then estimated cost, plus ten percent; this unit payment was later reduced somewhat in varying amounts, but after plaintiff's injury. The Truck Lines was paid at an hourly rate for handling by truck less than carload lots of the railroad freight either to or from the terminal; in other words, the Truck Lines was paid at specific rates for all services it performed for the Railroad. It acquired and maintained special tractors with hydraulic fifth wheels and other special equipment for use in the loading and unloading of trailers on the railroad cars.

At a time several years before plaintiff's injury defendant had constructed ramps on two adjoining tracks in its yards so that flatcars could be backed into position and trailers loaded on the cars by running them up the ramps. The details of these ramps are not well shown in our record. Between these two tracks defendant also constructed a "catwalk," elevated some 39 inches above the ties, 23 inches wide, and leaving a space of approximately 21 inches between the edge of the walk and the edge of the flatcar. (Plaintiff said it was somewhat more.) An exhibit in evidence shows that it was 54 inches from the top of the ties to the floor of a flatcar; some cars of a series on which plaintiff said he was working were approximately 12–14 inches higher. The railroad cars with special equipment for accommodating trailers were sometimes called "piggy-back" cars. When a loaded trailer was placed on a car the tractor was disconnected and, in lieu of the support of the tractor, the front end of the trailer was placed on a "stand" or "stanchion" (constructed as a part of the car) which could be lowered and raised, to which it was firmly fixed. The rear wheels of the trailer were then secured by chains which were run through the wheels or over the wheels and locked to the side rail or bottom of the car. The work on the chains was supposedly performed from the "catwalk" so far as possible, but plaintiff testified that it was often necessary for him to squat on the edge of the car in order to fasten or unfasten the chains and that he was doing so when injured. The loading and unloading of the trailers required a two-man crew. When the Railroad had trailers to be unloaded or loaded it notified the Truck Lines by a teletype maintained by the latter.

March 11, 1961, was Saturday; plaintiff and one other man (White) were the only ones on duty at the Truck Terminal, except possibly the dispatcher or foreman; for the first four hours plaintiff worked around the terminal or made deliveries with a truck. After lunch he and White received a teletype message that there were trailers to be unloaded, and they proceeded to the "piggy-back" ramp, presumably to unload cars on a certain track. White drove the tractor; plaintiff handled the "running down" of the stands and the removal of the chains. While engaged in removing a chain which he said had become lodged between dual wheels, standing or squatting on the side of the car, and reaching in between the wheels or over or through a wheel (it is not entirely clear), he fell backwards, struck the edge of the catwalk and thence fell to the ground. White went on and finished the job with such assistance as plaintiff could give. When they quit plaintiff reported his injury to the Truck Lines' official then in the office. Plaintiff's injuries are not in issue here, but we note that he returned to work in May, 1961, thereafter was off for periods of two weeks and one week, and has lost very little time since. He worked on the same job for about a year and a half and then "bid in" the job of driving a truck and handling freight solely for Montgomery Ward. He drew Workmen's Compensation as an employee of Truck Lines for 14–15 weeks after his injury until his counsel asked that the claim be "suspended"; thus, he never received a final disability rating. The negligence claimed was that the catwalk, constructed by defendant, was too low and too far from

the sides of the cars, requiring plaintiff to stand on the edges of the cars instead of working from the catwalk. Plaintiff had worked at this "piggy-back" job "on and off" for about three years, but not regularly.

Since the question of employment is our sole issue, it will be necessary to relate in some detail the testimony which plaintiff adduced in his attempt to show such control or right of control by the defendant of the "piggy-back" operations as would make him its employee. We shall first relate the substance of the testimony and rule upon its effect later. In so doing, we combine the substance of the testimony of plaintiff and of certain of his witnesses, Truck Lines employees, as follows. At times railroad car inspectors would come around and examine the cars, loaded or unloaded; while plaintiff said at one point that these men gave "instructions," he explained on cross-examination that what he meant was that the Inspectors told them if a car was "bad ordered" and could not be loaded or moved. Switch crews of the Railroad frequently came around and checked the loaded cars to see if the trailers were securely chained down, if the "stand" under the front end of the trailer was secured and locked, and if all "bridges" between cars had been raised and secured; the bridges were metal plates which were drawn between cars to permit the passage of tractors and trailers. If any of these things needed correction, the switch crews so told the men on the job, and they did not move the cars into a train until the necessary correction was made. On several occasions the repair track foreman (referred to as "rip" track foreman) came around to complain that the Truck Lines men had been using heavy hammers to loosen the pins which locked the "stand" in place and that they were putting "burrs" on the ends which made it difficult to use the pins again. The "stand" was a built-in part of the railroad car, and any damage to a car was normally referred to the repair track. This item only concerned the unloading of trailers. This occurred about 1958, and

that particular equipment was later replaced, the ramp was wired and an electric wrench was furnished and used. There was some testimony concerning the use of railroad tools; the Truck Lines had a toolbox near the site of these operations and furnished hammers and crowbars. While the testimony is very vague, it seems that on some occasions plaintiff and his co-worker procured larger "spike mauls" of the railroad to loosen the pins in the stands; plaintiff said: "We finally had to end up swiping some railroad spike mauls to knock it loose with"; and apparently it was the use of these large hammers that the repair foreman complained of. It appears also that the men at certain times used wrenches from the repair track. All this was eliminated, as we understand, when electricity was installed along the ramp and electric wrenches were furnished as a part of the ramp equipment. This apparently was done long before plaintiff's injury. Upon two or three occasions during one day and evening in 1959 Mr. Clay (working with plaintiff) got his tractor stuck in a mudhole beside one of the newly constructed tracks. The Railroad kept a caterpillar tractor in a yard somewhere in the vicinity; it was used by railroad employees to clean up the yard and parking area. Clay used the tractor to push a trailer load of steel out of the mud; on the first occasion this was done on his own volition but with permission,—the second time Mr. West, the roadmaster, told him "to use it"; the third time Mr. West used the tractor himself and "tore the back end out of a trailer." This difficulty was apparently eliminated when the railroad put gravel in the mudhole. Plaintiff testified that he had used the tractor at the direction of Mr. West, but he was not at all specific.

Plaintiff also relies upon the supposed actions and directions of railroad employees upon three specific occasions. In 1957 or 1958, when the "piggy-back" business was in its infancy, the railroad received a shipment of 45 trailer loads of flour, presumably for export. This was quite an occa-

sion,—"a great day's work" (as plaintiff testified), with some railroad "supervisory personnel" present, as well as Mr. Cooper, the Truck Lines Manager. When plaintiff had difficulty in loading a trailer one of the railroad men (according to his testimony) told him, "I said put it up there,"— which he did and tore up the tractor. Plaintiff testified that he had previously been told who these men were, and that this particular man told him who he was and that "he had the authority to tell me." On certain occasions shipments of wide steel matting for highway reinforcement were received on trailers; the steel extended about two feet beyond each side of the flatbed trailers. There was testimony that a prior similar shipment had struck the side of a bridge in Iowa and wrecked the train. On these occasions representatives of the railroad were present and assisted in "spotting" the trailers in the very center of the cars; they, of course, were familiar with the clearances of bridges and tunnels. Plaintiff's co-worker, Mr. Clay, stated that "we had moral assistance from both rail and truck line officials." On another occasion of an unstated date there had been a wreck near Orrick, Missouri, involving cars carrying loaded trailers. The railroad had brought the cars and trailers, "pieces of trailers" and contents to the ramp in Kansas City for unloading. The railroad roadmaster and superintendent and Mr. Cooper, the Truck Lines Manager, were all present. Mr. Clay testified that the railroad men had a crane there and they told us "which side we were to set up so they could get it off * * *" and remove the pieces of trailers. This was prior to 1961; plaintiff did not participate in that operation. We have tried to be very specific in describing all these occurrences, since certain highly conclusional references are made in the briefs to some of these matters.

It was shown that in August, 1958, defendant had issued a single trip pass to plaintiff furnishing transportation for him and his family on certain trains to Scotts Bluff, Nebraska, and return. This was issued to him as a driver for Burlington Truck Lines, and was procured for plaintiff by the Superintendent of the Truck Lines, as a "gratuity." All of plaintiff's wages were paid by the Truck Lines on time sheets which he turned in. No railroad employees belong to the Teamsters' Union.

■ Plaintiff's principal point, with several subheads, is that the trial court erred in entering judgment for defendant, because the evidence was sufficient to require submission of the employment issue. We shall cover the subpoints as we reach them. Counsel say that under the FELA decisions, any evidence "even the slightest," will make a jury issue. They cite Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493; Gallick v. Baltimore & Ohio Railroad Co., 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618; Fitzpatrick v. St. Louis-San Francisco Railroad Co., Mo., 300 S.W.2d 490; Dennis v. The Denver, Rio Grande Western Railroad Co., 371 U.S. 946, 83 S.Ct. 501, 9 L.Ed.2d 496, and Basham v. Pennsylvania Railroad Co., 372 U.S. 699, 83 S.Ct. 965, 10 L.Ed.2d 80. Those cases all involved issues of negligence or proximate cause under the FELA, and it was to the proof on those questions that the remarks relied upon by plaintiff were directed. On the other hand, it seems clear that the burden of proving *employment* by the defendant in FELA cases is on the plaintiff, that this question is to be determined under general law (general federal law, if there be any difference), and that the terms "employer" and "employee" are used in the act in their usual and natural sense. Ward v. Atlantic Coast Line Railroad Co. (CA 5), 265 F.2d 75; Baker v. Texas & Pacific Railroad, 359 U.S. 227, 79 S.Ct. 664, 3 L.Ed.2d 756; Jones v. New York Central Railroad (CA 6), 182 F.2d 326; Robinson v. Baltimore & Ohio Railroad Co., 237 U.S. 84, 35 S.Ct. 491, 59 L.Ed. 849; Gloster v. Pennsylvania Railroad (WD Pa.), 214 F.Supp. 207; Cimorelli v. New York Central (CA 6), 148 F.2d 575.

Here plaintiff concedes that he was in the general employment of Truck Lines, but he insists that, under the evidence, the railroad was also a joint employer at the time of his injury. This, in turn, depends largely upon the extent of control which the Railroad exercised or reserved over the activities in the "piggy-back" loading and unloading. Chicago, Rock Island & Pacific Railway Co. v. Bond, 240 U.S. 449, 36 S.Ct. 403, 60 L.Ed. 735. Certain other elements do enter into the consideration. Mazzucola v. Pennsylvania Railroad Co. (CA 3), 281 F.2d 267. Plaintiff relies rather strongly on Baker, supra, as to the sufficiency of the evidence, but Baker does not, either by its own language or by subsequent constructions, hold that *any* evidence which may possibly tend to show employment forecloses a directed verdict or a summary judgment. In that case the work of reinforcing or "grouting" the railroad's roadbed had been let out to a contractor; however, it was shown that supervisory employees of the railroad defendant had continuously and daily selected the precise points at which a mixture of cement and sand should be pumped into the roadbed, and the consistency of the mixture to be used; also, when the workmen should move to another selected spot. This "grouting" work was a regular part of the maintenance of the road, and the railroad furnished the material. It was held in substance, and under that evidence, that the defendant had reserved sufficient control over the details and manner of doing the work to create a jury issue on the question of employment, and that all reasonable minds could not arrive at a contrary conclusion.

It will not be practicable to distinguish all of plaintiff's cited cases individually. They are cited largely to show the measure of control necessary to constitute the defendant an employer. One particularly relied on is Cimorelli v. New York Central Railroad (CA 6), 148 F.2d 575. There the United States had, by contract, obtained from the railroad the use of a storage yard, and the defendant railroad had contracted with Duffy Construction Company to load and unload the freight there, upon a cost plus basis. An employee of Duffy was injured and sued the railroad under the FELA. If Duffy were a true independent contractor, there would have been no liability on the defendant. It was held, after a lengthy discussion of the various tests, that there was a sufficient degree of control by the defendant to create a jury issue on the matter of employment. It appeared there: that defendant's supervisory personnel selected the times and places for all unloading and loading, determined the number of employees Duffy should have, approved or disapproved all wages and salaries, and decided what tools, materials and supplies should be purchased; that the title to all tools and materials vested in the railroad; that the defendant determined what cost items would be approved, with full accounts to be furnished. The court noted that the defendant had retained substantially full control over the work, which was in fact an integrated part of its yard operations, and that actually the primary contract with the government required the defendant to control and supervise all such activities. It is not surprising that, upon those facts, the case was held to present a jury issue on the employment question, by reason of the control not only reserved but actually exercised over almost all details of the performance. Counsel also cite: Byrne v. Pennsylvania Railroad Co. (CA 3), 262 F.2d 906; Baltimore & Ohio Southwestern Railroad Co. v. Burtch, 263 U.S. 540, 44 S.Ct. 165, 68 L.Ed. 433; Pennsylvania Railroad v. Roth (CA 6), 163 F.2d 161. In Byrne, an electrical engineer of Westinghouse was loaned to the railroad for a very considerable period of time, riding its trains, checking up on the equipment and very substantially participating in the operations of the railroad. Roth, supra, was another storage yard case somewhat similar to Cimorelli, but on weaker facts and with little meaningful discussion.

Burtch is so wholly different as not to merit discussion.

In a subpoint counsel urge that anyone "furthering the operational activities of the railroad" is an employee; they cite thereon, Sinkler v. Missouri Pacific Railroad Co., 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799, and Carney v. Pittsburgh & Lake Erie Railroad Co. (CA 3), 316 F.2d 277. In Sinkler, a cook on the private car of the defendant's general manager was injured by the negligent switching of the car by the Houston Belt Railroad. He sued his own general employer, the Missouri Pacific. The court held that the Belt Railroad was an agent of the Missouri Pacific for the contracted switching purposes and that its negligence was the negligence of one of the "officers, agents or employees" of defendant, under the terms of the act. That determination was not at all the same as the one we are required to make here; there was no consideration of the question of control or other features necessary to make an individual an employee of someone other than his general employer. The handling of defendant's train in furtherance of its business was merely held to make the Belt Railroad and its employees "agents" (not "employees") of the defendant. Two justices dissented and two concurred on the ground that defendant's duty could not be delegated. Carney, supra, involved an injury to a lineman in the regular employ of defendant, while he was on work away from home and was staying at the railroad YMCA at defendant's direction and expense. A defective bed fell with him during the night. The court held that the YMCA was, at the time, performing "operational activities" for the defendant. Actually, the real holding would seem to be that the injury was one incident to plaintiff's regular employment. The loading of cars is normally not a part of the operating functions of a railroad. They are delivered empty to the consignor, who does that work himself.

■ Counsel also argue that the Burlington Truck Lines was set up by defendant as an "illegal device" to avoid liability under the FELA and that such is prohibited and "void." They emphasize the sole ownership of the stock and the presence of railroad officers on the Truck Lines board; so, they say, the Truck Lines is merely an agent of the railroad. They cite: Davis v. Alexander, 269 U.S. 114, 46 S.Ct. 34, 70 L.Ed. 186; Eddings v. Collins Pine Co., D. C., 140 F.Supp. 622; Ward v. Atlantic Coast Line Railroad Co., 5 Cir., 265 F.2d 75; Del Vecchio v. Pennsylvania Railroad Co., 3 Cir., 233 F.2d 2, and Sinkler v. Missouri Pacific Railroad Co., 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799. In Davis, one railroad operated another as part of a single system. In Eddings, a railroad carrier sought to delegate all its operating functions to a corporation which was not a common carrier. Ward recognized the existence of an independent contractor relationship, as did Del Vecchio. We fail to understand why counsel has cited some of these cases.

■ In the absence of fraud, connivance or an undue domination, the law recognizes the separate entities of corporations, even though one owns the stock of the other; and this principle is applicable in solving questions of employment, as here. Nor is the one, for that reason, the alter ego of the other. Garrett v. Southern Railway Co. (DC Tenn.), 173 F.Supp. 915; aff. CA 6, 278 F.2d 424; Kentucky Electric Power Co. v. Norton Coal Mining Co. (CA 6), 93 F. 2d 923; Gaulden v. Southern Pacific Co. (DC Cal.), 78 F.Supp. 651; Fawcett v. Missouri Pacific Railroad Co. (DC La.), 242 F.Supp. 675, aff. CA 5, 347 F.2d 233. In the latter case the court said, in part, at 242 F.Supp., loc. cit. 677–678: "As we analyze it, plaintiff's real contention is that because the trucking company is a wholly owned subsidiary of the defendant, it, the trucking company was the alter ego, adjunct, subsidiary agent, and instrumentality of the railroad. The jurisprudence as we read it is to the contrary. (Citing cases.) * * * Plaintiff has alerted us to avoid inter-company arrangements drawn to avoid

federal jurisdiction under the FELA. We find nothing here indicative of such a purpose, but we point out as did the Third Circuit (Shaw v. Monessen Southwestern R. R. Co., 200 F.2d 841) that we should also be alert to avoid the extension of a statute applicable to railroad employees in interstate transportation to cover those engaged in other occupations. Such an extension might well deprive a widow and children, as it would here, of their rights under a state compensation act where their right of recovery would not depend upon proof of negligence. * * * A corporation is ordinarily an entity, separate and apart from its stockholders, and mere ownership of all of the stock of one corporation by another and the identity of officers of one with officers of another are not alone sufficient to create identity of corporate interests between the two or the relation of principal and agent between them." We find nothing in the record here to indicate fraud or any collusive device. The Truck Lines was operated as a wholly independent entity, serving the public generally over a far-flung territory, hiring and firing its own employees, paying its own expenses and taxes, carrying its own insurance, owning its own equipment and generally controlling its own independent operations. It performed similar work in loading and unloading trailers at Chicago for various freight forwarders. It was in no way engaged in the railroad business. And, as held in Ward v. Atlantic Coast Line Railroad, supra, the "device" argument cannot in any event be used to *create* employment under the FELA.

In many FELA cases the courts have recognized the existence of an independent contractor relationship, holding that unless the relationship is in some way subverted, the employees of the contractor *remain* his employees and no one else's. Chicago, Rock Island & Pacific Railway Co. v. Bond, 240 U.S. 449, 36 S.Ct. 403, 60 L.Ed. 735; Gaulden v. Southern Pac. Co. (DC Cal.), 78 F.Supp. 651; Latsko v. National Carloading Co. (CA 6), 192 F.2d 905; Jones v. New York Central Railroad (CA 6), 182 F.2d 326; Wells Fargo & Co. v. Taylor, 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205; Fawcett v. Missouri Pacific Railroad Co. (DC La.), 242 F.Supp. 675, aff. CA 5, 347 F.2d 233; Gloster v. Pennsylvania Railroad (WD Pa.), 214 F.Supp. 207; De Paola v. New York, New Haven & Hartford Railroad (DC Conn.), 198 F.Supp. 12; Aguirre v. Southern Pac. Railroad (Ct.App.Cal.), 43 Cal.Reporter 73; Schiemann v. Grace Line, Inc. (CA 2), 269 F.2d 596 (Jones Act); Valentine v. South Coast Corp. (DC La.), 218 F.Supp. 148. These cases consider, generally, the extent of control necessary to make an employee of the independent contractor an employee of the other contracting party, and further hold that the term "employee" is to be given its usual and natural meaning in FELA litigation. It would be wholly impracticable to discuss the facts of all these individual cases. Generally, the reservation of the right to control the details of the work, as distinguished from its result, is the material factor. Bond, supra. We note in passing: that "occasional directions" given by a railroad crew to the employees of a carloading company working on railroad premises are not controlling (Latsko); that express messengers, working regularly on trains in cars furnished by the railroad, are not its employees (Jones, Wells Fargo) nor is there a joint employment; that an employee of Missouri Pacific Truck Lines, crushed between two highway trailers being loaded on a flatcar of the Missouri Pacific Railroad, was not an employee of the railroad, when hired and paid by the wholly owned subsidiary, and that he was not doing railroad work (Fawcett); that a general control over all transportation functions does not suffice to make an employee of the Pullman Company an employee (also) of the railroad (Gloster). In De Paola, Fawcett and Aguirre summary judgments were entered; in Schiemann, a verdict was directed; in

Gaulden, Bond, Jones and Wells Fargo the issue was decided by the court as a matter of law, either by reversal of a judgment, dismissal of the case, or the entry of a defendant's judgment.

■ Every case of this character must rest upon its own facts, and we should consider the adjudicated cases as mere guidelines. Before evaluating the evidence, we note again that mere suggestions and cooperation by the railroad do not constitute control, nor do they make an employee of the Truck Lines *its* employee. Latsko v. National Carloading Co. (CA 6), 192 F.2d 905; O'Brien v. Rindskoff, 334 Mo. 1233, 70 S.W.2d 1085; Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480; and it is the relationship existing *at the time* of the injury which is material. De Paola v. New York, New Haven & Hartford Railroad Co. (DC Conn.), 198 F.Supp. 12; McFarland v. Dixie Machinery & Equipment Co., 348 Mo. 341, 153 S.W.2d 67, 136 A.L.R. 516. We have seen that, even under the most recent federal decisions, if reasonable minds cannot differ on the effect of the evidence and its inferences, no jury issue exists.

The so-called "instructions" from car inspectors were conceded to be mere determinations of the condition of the car itself, and were immaterial. The inspections by the switch crews were made to make certain that the loads were properly secured and would not shift, and that the cars were ready to move; this, regardless of any regulations or tariff provisions now referred to, was a function which the railroad would and should normally perform as a safety measure and for its own protection. It was, in actuality, an inspection of the *result* of the work performed. The complaints of the repair track foreman were likewise made in an effort to protect railroad property, and these could not logically constitute the exercise of any control over the details of the work; and, certainly, if railroad "control" was to be exercised, he would not seem to be the appropriate supervisor. The evidence concerning the use of railroad tools was so vague that it hardly constitutes substantial evidence; generally, it seems, these men at certain times appropriated one or more large hammers or mauls for one specific operation and these were the very tools that the foreman complained of. There was some evidence of the use of Railroad wrenches for a time. None of the times is fixed, even approximately. No established practice of the Railroad to furnishing tools was shown, nor would that element, in and of itself, be very persuasive. The whole method was apparently changed before plaintiff's injury, when electric wiring was installed. The permissive use of the railroad tractor on a very few occasions to push trailers out of a mudhole was a mere act of courtesy, a form of cooperation, necessitated by the fact that the railroad had not at that time properly constructed the access route to the ramp. The tractor was not even kept at the "piggyback" ramp, but was obtained from some other place.

The three instances concerning the loading of the flour, the loading of the highway steel matting and the unloading of the broken-up trailers (following a wreck) were single, isolated occurrences, one in 1957–1958, and all prior to 1961. The precise spotting of the trailers with the wide steel matting was absolutely necessary for the protection of the railroad and its property and constituted no exercise of control in the ordinary sense. In this, again, it was the *result* that the Railroad was interested in. The unloading of the broken trailers in 1959 or 1960 was not a job within the ordinary contemplation of the Truck Lines' contract; the railroad superintendent and roadmaster and the Truck Lines Manager were all "helpful" as they should have been. The contract, as we understand, did not contemplate the salvaging of wrecks. The railroad had furnished a crane and necessarily participated in such an unusual job. It was also the railroad's financial responsibility to salvage as much from the wreck as possible, and it recog-

nized this. This evidence is of no real significance. The loading of the 45 trailers of flour apparently turned into a sort of celebration; dignitaries were there, including (according to plaintiff's hearsay testimony) certain railroad officials, and the Truck Lines Manager. The only significant part of this testimony is plaintiff's statement that one railroad man (whom he could not identify) told him, when he had trouble getting a trailer loaded on the car, to "put it up there" which he did, ruining the tractor. This was a strictly isolated incident occurring approximately three years before plaintiff's injury. It represented, probably, a spontaneous outburst by an overly-enthusiastic employee. Standing alone, it does not warrant an inference of control sufficient to make a submissible issue here. The trip pass given to plaintiff and his family in 1958 was not issued to him as a railroad employee, but specifically as a Truck Lines employee; it was a courtesy extended at the request of a Truck Lines officer. Whether its issuance was illegal under federal law (as plaintiff contends) or not, it *was* issued and used, but its issuance has no relevance here on the question of employment.

■■ We have concluded that the defendant contracted with the Truck Lines to load and unload as an independent contractor, that nothing was done to impair that relationship, and that plaintiff remained solely the employee of the Truck Lines. We further find that on this evidence reasonable minds could not differ, and that the trial court properly sustained defendant's motion for judgment and entered judgment for it. In this situation a consideration of the instructions becomes unnecessary.

Plaintiff's motion to strike respondent's supplemental brief, which was ordered taken with the case, is overruled. The judgment of the trial court is affirmed.

All concur.