Julius V. PHELPS, Respondent,

v.

MISSOURI–KANSAS–TEXAS RAILROAD COMPANY, a Corporation, Appellant.

No. 53217.

Supreme Court of Missouri, Division No. 1.

July 8, 1968.

Motion for Rehearing or to Transfer to Court En Banc Denied Sept. 9, 1968.

Certiorari Granted Jan. 27, 1969.
See 89 S.Ct. 720.

Edgar S. Carroll, Thos. J. Conway, Kansas City, John E. Bardgett, St. Louis, for respondent, Popham, Thompson, Popham, Trusty & Conway, Kansas City, Haley & Bardgett, St. Louis, of counsel.

Frank J. Rogers, Kansas City, for appellant.

HIGGINS, Commissioner.

Action under Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–60, for personal injuries sustained by plaintiff while allegedly an employee of defendant. Verdict and judgment were for plaintiff for $25,000.

The dispositive issue is whether plaintiff was an employee of defendant within the meaning of the Act at the time of his injury.

Plaintiff alleged he was an employee of defendant in interstate commerce on November 22, 1960, and, while placing a trac-

tor-trailer motor vehicle on a flat railroad car, was attempting to disconnect the tractor when, due to negligence of defendant, he fell to the ground and was injured.

Defendant denied employment of plaintiff and alleged that he was the employee of Co-Ordinated Transportation Company.

There is no question that appellant was a common carrier by railroad in interstate commerce. Julius V. Phelps was 48 years of age at the time of this injury. He had been a truck driver since 1932 and a member of the teamsters' union since 1934. In 1942 he began driving for Columbia Motor Transport Company (predecessor of Co-Ordinated) which was then leasing trucks to the Missouri Pacific Railroad.

On June 20, 1946, MKT (or Katy) contracted with Columbia for the handling of less-than-carload (LCL) freight over certain highway routes to stations on MKT lines. The freight moved on railroad billing and Columbia was paid at a rate per truck mile. Columbia changed its corporate name to Co-Ordinated Transportation Company September 11, 1952. MKT acquired all Co-Ordinated stock January 7, 1957, to enable it to use the service by motor vehicle to public advantage in its operations. MKT has used the services of Co-Ordinated since 1948 under written contract. Co-Ordinated provided vehicles bearing MKT emblems and drivers to haul MKT LCL freight. The purpose was to eliminate costly stops for LCL freight and to afford a more attractive service to the shipper. In the words of Co-Ordinated's general manager, Co-Ordinated "operated a substitute truck line for the railroad on a contract basis."

Throughout his employment by Co-Ordinated, Mr. Phelps's teamster's union dues and union scale wages were paid by Co-Ordinated. Co-Ordinated also paid his pension fund, group insurance, and hospitalization charges and deducted his Social Security. He paid for his chauffeur's license.

Under the contract between Co-Ordinated and MKT, Co-Ordinated executed the wishes of MKT, did not hold itself out to the public, did not solicit business, and was devoted entirely to MKT freight business to and from stations on the MKT line; in this instance, between New Franklin, Missouri, and Parsons, Kansas.

Annual corporate reports to the Missouri Public Service Commission for the year ending December 31, 1960, showed Co-Ordinated and MKT to share some of the same officers and directors. They did not receive any compensation from Co-Ordinated. Co-Ordinated's employees were 49 truck drivers and all, as was plaintiff, were paid by Co-Ordinated. After acquisition by MKT, Co-Ordinated's truck and tractor repair work was done at Parsons and Co-Ordinated drivers used the railroad private rail telephone. Co-Ordinated handled MKT mail and considerable MKT property on the LCL freight run, as well as LCL freight. No separate billing was made for that service, the rate for all carriage being per truck mile. MKT performed certain accounting services for Co-Ordinated and Co-Ordinated payroll checks were signed by one who was also an officer in MKT.

At the time of his accident, Mr. Phelps was operating on a scheduled run from New Franklin to Sedalia, Missouri, and back to New Franklin. He would take his tractor from Boonville to the New Franklin yards, unload a trailer loaded with LCL freight from a "piggyback" car. He would proceed by highway and unload the freight at various MKT stops such as Boonville, Pilot Grove, Clifton Hill, and Sedalia. He would make some collections. In returning to New Franklin, he would receive freight along the way. With the tractor thus loaded, he would reload it on a piggyback car for shipment to other MKT points. He carried a key to the various freight houses to obtain entry when station personnel were not on duty. Mr. Phelps sustained injury while detaching the tractor from the trailer in completion of the process of loading the trailer onto the piggy-

back car. The ramp and tracks at the loading site were MKT property.

Mr. Phelps also inspected automobiles on highway trailers being carried in the MKT piggyback operation. In that capacity, he checked for loose chains and would report his inspection to the yard office. Orders for this work, as well as for the LCL and MKT mail and property hauling, came through Co-Ordinated personnel.

Between 1957 and 1959 MKT advanced funds to Co-Ordinated for purchase of tractor-trailer equipment. These loans were repaid to MKT by Co-Ordinated.

Co-Ordinated had a rent-free office in the Katy Building in Dallas, Texas, and Co-Ordinated drivers had a room in the MKT freight station in Parsons, Kansas.

Following his injury, Mr. Phelps was taken to St. Joseph Hospital by the MKT local superintendent. Upon admission, he gave his occupation as "truck driver, Katy Railroad Company." He was treated by Dr. T. C. Beckett who was also the MKT Division doctor at Boonville. The St. Joseph Hospital record showed that in giving his history, Mr. Phelps stated his employer to be Co-Ordinated Transportation Company and his occupation to be truck driver. While in Bothwell Hospital in Sedalia February 14 and February 20, 1961, he gave his occupation as truck driver for Co-Ordinated Transportation Company. When he applied for a position on the Sedalia police force after leaving Co-Ordinated, he gave that company as a former employer reference.

Mr. Phelps filed a claim under the Missouri Workmen's Compensation Act for his injuries in this accident and asserted he was an employee of Co-Ordinated Transportation Company. He was assisted in the preparation of his claim by his present counsel, Mr. Edgar S. Carroll. He has received such compensation as well as Missouri unemployment compensation.

Section 1 of the Federal Employers' Liability Act, 45 U.S.C.A. § 51, provides that every common carrier by railroad, while engaging in interstate commerce, shall be liable in damages to any person suffering injury while employed by such carrier.

To establish a case of liability against such a carrier the claimant must establish, among other things, that he, at the time of injury, was an employee of the carrier. Miles v. Pennsylvania R. Co., 7 Cir., 182 F.2d 411, 413[1]; Ward v. Atlantic Coast Line Railroad Co., 5 Cir., 265 F.2d 75, 83[4]. The burden of proving employment by the railroad in such cases is on the plaintiff and this question is to be determined "under general law (general federal law, if there be any difference), and * * * the terms 'employer' and 'employee' are used in the act in their usual and natural sense." Turpin v. Chicago, B. & Q. R. Co., Mo., 403 S.W.2d 233, 237[1].

Appellant contends that it should have had a directed verdict because this evidence fails to show plaintiff to be a railroad employee and, to the contrary, showed that he was the employee of Co-Ordinated operating as an independent contractor under written contract with MKT.

Respondent concedes that "the nominal employer of the plaintiff was Co-Ordinated," but argues that "Co-Ordinated was so controlled by its parent corporation, the defendant herein, that the corporate entity of Co-Ordinated should be disregarded and the plaintiff thereby made an employee of defendant as a matter of law."

The evidence adduced by plaintiff indicates that he relied on the relation between Co-Ordinated Transportation Company and the defendant railroad for submission of the issue of employment to the jury. Particular emphasis in detail was made upon Co-Ordinated being wholly owned by MKT, the interlocking directorate and duplication of officers in the two corporations, the accounting and office services furnished Co-Ordinated by MKT, and the mail and property hauling services rendered to MKT by Co-Ordinated. These matters, however, are not sufficient to destroy the separate corporate

entity of Co-Ordinated and MKT because: " * * * a corporation is ordinarily an entity, separate and apart from its stockholders, and mere ownership of all the stock of one corporation by another, and the identity of officers of one with officers of another, are not alone sufficient to create identity of corporate interest between the two companies or to create the relation of principal and agent or to create a representative or fiduciary relationship between the two. If such stock ownership and potential control be resorted to only for the purpose of normally participating in the affairs of the subsidiary corporation in a manner usual to stockholders and not for the purpose of taking some unfair advantage of the subsidiary or using it as a mere adjunct to the main corporation or as a subterfuge to justify wrongdoing, their identity as separate corporations will not be disregarded but their respective rights when dealing with each other in respect to their separate property will be recognized and maintained. The extent of stock ownership and mere potential control of one company over another has never been regarded as the determining factor in the consideration of such cases. Something must be disclosed to indicate the exercise of undue domination or influence resulting in an infringement upon the rights of the subservient corporation for the benefit of the dominant one. Otherwise, the rights of the separate corporations in respect to their corporate property must be governed by the rules applicable in ordinary cases." Garrett v. Southern Railway Co., 6 Cir., 278 F.2d 424, 425; Kentucky Electric Power Co. v. Norton Coal Mining Co., 6 Cir., 93 F.2d 923, 926[2–5].

In an attempt to avoid the effect on his case of the foregoing authority, respondent contends that the facts disclose an undue domination by the railroad corporation over its subsidiary, the trucking corporation. To state his theory, plaintiff cites Fletcher Cyclopedia, Corporations, Permanent Edition, Vol. 1, § 43, p. 203: "A very numerous and growing class of cases wherein the corporate entity is disregarded is that wherein it is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation. The control necessary to invoke what is sometimes called the 'instrumentality rule' is not mere majority or complete stock control but such domination of finances, policies, and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal."

Respondent cites no authority for application of Fletcher's rule except Kentucky Electric Power Co. v. Norton Coal Mining Co., supra, and Turpin v. Chicago B. & Q. R. Co., supra, which do not apply the rule but simply recognize it. Indicative of the lack of support it gives to respondent's theory is the statement of recognition in Turpin v. Chicago B. & Q. R. Co., supra, 403 S.W.2d 1. c. 239[3]: "In the absence of fraud, connivance or an undue domination, the law recognizes the separate entities of corporations, even though one owns the stock of the other; and this principle is applicable in solving questions of employment, as here. Nor is the one, for that reason, the alter ego of the other."

Rather than to support a theory of "undue domination," Turpin v. Chicago B. & Q. R. Co., supra, is to the contrary and supports appellant's position. In that case, similar contentions for disregarding separate corporate entities were made under a similar fact situation. The court affirmed a directed verdict against the employee in his suit against the Burlington as his alleged employer.

Turpin v. Chicago B. & Q., supra, cited with approval Fawcett v. Missouri Pacific R. R. Co., D.C.W.D.La., 242 F.Supp. 675, aff. 347 F.2d 233. The situation there was even closer in point to this case. Fawcett was never employed directly by the railroad but was employed by Missouri Pacific Truck Lines, Inc., a wholly owned subsidiary of the railroad. His work consisted of loading and unloading in the transportation of freight by highway which the railroad was not licensed to do. Plaintiff contended the

facts made a jury question whether Fawcett was an employee of the railroad under FELA on the theory the worker was an employee of an adjunct or agent of the railroad, i. e., that because the trucking company was a wholly owned subsidiary of the defendant, the trucking company was the alter ego, adjunct, subsidiary agent, and instrumentality of the railroad. In rejecting the contention the court relied, as does this decision, on the quotation from Garrett v. Southern Railway Co., supra, and Kentucky Electric Power Co. v. Norton Coal Mining Co., supra.

■ The test whether a parent corporation exerts an undue domination over its subsidiary to justify disregarding separate corporate entities is "whether or not the arrangement involved is being used for a proper purpose. * * * Making a corporation a supplemental part of an economic unit and operating it without sufficient funds to meet obligations to those who must deal with it would be circumstantial evidence tending to show either an improper purpose or reckless disregard of the rights of others. * * * If any intercorporate affiliation is devised for or is being used to accomplish an improper or unlawful purpose, certainly equity does have the authority to tear down technical legal barriers and reach beyond them to impose liability or grant proper relief. If the purpose is lawful, and fair and equitable to those with whom it is intended to deal, legal forms and relationships should be observed. Men have the right to use legal forms which they believe to be helpful in accomplishing proper purposes. The question should not be merely 'instrumentality,' but 'instrumentality for what purpose.'" May Department Stores Co. v. Union Electric L. & P. Co., 341 Mo. 299, 107 S.W.2d 41, 55[11].

■ There was no evidence to show that Co-Ordinated was not a going, solvent corporation, or that the purposes of both the Co-Ordinated and MKT corporations were anything but proper. Co-Ordinated had for its purpose furnishing substitute rail freight service by highway for MKT; MKT, as a railroad carrier, acquired Co-Ordinated in order to improve its railroad freight service. At all times Co-Ordinated remained an independent contractor, paid at a rate per truck mile in carrying out the service for MKT. Neither does the evidence show any infringement of the rights of the subservient trucking corporation to the benefit of the dominant railroad corporation, nor is there any attempt to demonstrate that the arrangement between Co-Ordinated and MKT was an "illegal device" to avoid liability under Section 5 of FELA.

■ Respondent places additional emphasis on the duty of inspecting automobile trailers on piggyback cars as showing he was an employee of the railroad. It is not necessary to determine whether plaintiff might have been the joint employee of Co-Ordinated and MKT when performing such service. Plaintiff was not engaged in that service at the time of his injury "and it is the relationship existing *at the time* of the injury which is material." Turpin v. Chicago B. & Q. R. Co., supra, 403 S.W.2d l. c. 241[4].

This matter, as well as carrying keys to railroad freight offices and collecting freight bills, was an obvious accommodation to the railroad and railroad personnel, but such items did not make Mr. Phelps an employee of MKT. His situation was similar to that of the Pullman porter who sought to hold the railroad liable for injuries sustained while his Pullman car was being hauled by a railroad. The porter took and sold tickets and gave them and the proceeds to the railroad conductor when he came on duty. The court denied that such circumstances qualified the porter as a railroad employee under the usual and natural sense of "employee" and "employer." Robinson v. Baltimore & Ohio R. R., 237 U.S. 84, 93–94, 35 S.Ct. 491, 59 L.Ed. 849.

All the evidence shows that MKT contracted with Co-Ordinated to load and unload piggyback trailers and operate a sub-

stitute freight service over a highway route as an independent contractor, and nothing was done to destroy that relationship. Under such circumstances plaintiff was solely the employee of Co-Ordinated at the time of his injury and must look, as he has done, to that employer for his compensation.

The similarity of this case to Turpin v. Chicago B. & Q. R. Co., supra, and Fawcett v. Missouri Pacific R. R. Co., supra, is such that, as in those cases, reasonable minds could not differ, Turpin v. Chicago B. & Q. R. Co., supra, 403 S.W.2d l. c. 242[5, 6]; appellant should have had a directed verdict on the issue of employment, and the judgment is reversed.

HOUSER, C., concurs.

WELBORN, C., not sitting.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.